# IN THE SUPREME COURT OF IOWA

No. 18–0477

Filed June 28, 2019

**JULIO BONILLA,**

Appellant,

vs.

**IOWA BOARD OF PAROLE,**

Appellee.

_____

Appeal from the Iowa District Court for Polk County, Douglas F. Staskal, Judge.

Julio Bonilla appeals dismissal of his petition for judicial review. **AFFIRMED.**

Rita Bettis Austen of ACLU of Iowa Foundation, Des Moines, Steven Macpherson Watt of ACLU Foundation, New York, New York, Angela L. Campbell of Dickey & Campbell Law Firm, P.L.C., Des Moines, and Gordon E. Allen, Johnston, for appellant.

Thomas J. Miller, Attorney General, and John R. Lundquist, Assistant Attorney General, for appellee.

Brent Michael Pattison of Drake Legal Clinic, Des Moines, Marsha L. Levick of Juvenile Law Center, Philadelphia, Pennsylvania, and Benjamin G. Bradshaw, Kimberly Cullen, and Kendall N. Collins of

O'Melveny & Myers, LLP, Washington, D.C., for amicus curiae Juvenile Law Center.

John S. Allen and Bram T.B. Elias of University of Iowa College of Law Clinical Law Programs, Iowa City, and Sarah French Russell of Quinnipiac University School of Law Legal Clinic, Hamden, Connecticut, for amici curiae Juvenile Sentencing Project and Campaign for the Fair Sentencing of Youth.

**APPEL, Justice.**

In this case, Julio Bonilla, the petitioner, convicted of kidnapping for an act committed when he was sixteen years old, brought a petition for judicial review in district court pursuant to the Iowa Administrative Procedures Act, Iowa Code section 17A.19 (2016), challenging the manner in which the Iowa Parole Board (Board) considers whether persons convicted of offenses while a juvenile should be granted parole.

Specifically, Bonilla sought a declaratory judgment that a variety of substantive and procedural rights are required when a juvenile offender is considered for parole under article I, sections 9 (due process), 10 (right to counsel), and 17 (cruel and unusual punishment) of the Iowa Constitution and the Eighth Amendment (cruel and unusual punishment) and the Fourteenth Amendment (due process) to the Federal Constitution. In addition, Bonilla sought an order remanding the matter back to the Board and requiring it to provide him with the procedural rights requested in his petition. Bonilla further sought attorney fees and costs.

The Board moved to dismiss the petition. The district court denied the motion to dismiss. The district court later proceeded to rule in favor of the Board on the merits. Bonilla appeals. For the reasons expressed below, we affirm.

## I. Factual and Procedural Background.

In 2005, Bonilla was convicted of kidnapping in the first degree. His criminal conviction arose from a New Year's Eve abduction of a pregnant sixteen-year-old girl who was grabbed off the street while she walked home, thrown into Bonilla's vehicle, and, over a four-hour period, hit, slapped, hair-pulled, bitten on the face and neck, and raped. After four or five hours, the victim was ultimately thrown out of the vehicle without her shoes or underwear, with the shout "Happy New Year."

Bonilla was sixteen years old when he committed the crime. He was sentenced to life in prison without the possibility of parole (LWOP). In 2005, Bonilla began serving his prison sentence at Anamosa State Penitentiary. In 2008, Bonilla was transferred to Fort Madison after twice fighting other inmates in gang-related incidents.

Following the elimination of LWOP for juvenile nonhomicide offenders by the United States Supreme Court in *Graham v. Florida*, 560 U.S. 48, 74–75, 130 S. Ct. 2011, 2030 (2010), and after this court held that the principles of *Graham* apply retroactively to Bonilla, *Bonilla v. State*, 791 N.W.2d 697, 700–01 (Iowa 2010), he was resentenced on April 29, 2011 by the district court to life with the possibility of parole. The district court, however, wrote a letter to the Board that stated,

> I am also enclosing for your review my Findings of Fact, Conclusions of Law and Ruling entered on February 25, 2005. I would strongly suggest that you carefully review the Findings of Fact set forth in my ruling paying special attention to what this defendant and his friends suffered this victim to endure for approximately 4-5 hours.
>
> After reviewing the matters I have discussed above I am sure you will understand why I am recommending that under no circumstances should [Bonilla] be considered for any type of early release or parole.

After his resentencing in 2011, and beginning in 2012, Bonilla began to receive annual parole reviews by the Board.

According to Bonilla's disciplinary summary, he received additional disciplinary reports after we ordered resentencing in 2010. Bonilla received additional major reports, including reports for possession of cocaine, possession of a "hit" note,[1] possession of pornography, bartering goods, possession of marijuana, STG (security threat group) show of force, and running a gambling ring. Since 2014, however, Bonilla has not

---

[1] The meaning of the phrase hit note is unclear from the record.

received a new major report. He began to receive glowing accounts of his activities in prison.

At his annual review on June 24, 2015, Bonilla was denied parole as in previous years. Among other things, the Board noted,

> Your record of major or minor reports suggests you are not prepared for a successful return to the community. The Board of Parole needs to see a period of behavior which is free from institutional reports prior to considering you for an early release.

As Bonilla approached his annual review date in June of 2016, the Board prepared a release plan for Bonilla. The release plan noted that his recent adjustment had been outstanding. The release plan recommended that Bonilla complete the Sex Offender Treatment Program (SOTP) and the Thinking for Change program (TFC), along with a significant period of gradual release, prior to being paroled. The release plan noted that a psychiatric examination had occurred on April 25, 2016, which revealed nothing notable.

As his 2016 annual review date approached, Bonilla filed nine motions in connection with his annual review. In the motions, Bonilla sought (i) appointment of counsel at state expense, (ii) provision of an independent psychological evaluation at state expense, (iii) an in-person parole review hearing and interview, (iv) an opportunity to present evidence at the parole hearing, (v) access to information related to his parole review and a right to challenge the information, (vi) exclusion of all nonverifiable evidence, (vii) proper consideration of mitigation factors of youth, (viii) access to rehabilitative treatment and programming, and (ix) establishment of procedures in the event of denial of parole.

The Board's counsel responded to Bonilla's motions on June 22. The Board's counsel informed Bonilla that the Board agreed to continue

his annual review until July 28. The Board's counsel noted there was no motion practice in connection with annual reviews and the Board would log the filings as correspondence in support of release. The Board's counsel also stated, "I consider the constitutional issues raised in those motion[s] to have been presented to the Board for exhaustion purposes."

On July 13, the Board produced "copies of records pertaining to Julio Bonilla . . . that are available to the Iowa Board of Parole for use in its review of Mr. Bonilla for parole release." The records produced included prison disciplinary rulings, other notes related to Bonilla's conduct in prison, parole release plans, and psychological and psychiatric evaluations. The Board declined to produce "any victim statement" and Bonilla's presentence investigation report.

In addition to the document disclosure, the Board permitted counsel for Bonilla to provide a written statement in support of his request for release. The Board further allowed counsel to appear in person at the 2016 review annual review.

Bonilla's annual review occurred on July 28. It lasted about thirty minutes and was transcribed. Bonilla's counsel directed the Board's attention to her client's rehabilitative progress. She stated that Bonilla would benefit from SOTP and TFC. She added that Bonilla, a native of El Salvador, was in a unique position because the immigration authorities had a detainer on him, and that upon his release, he would be transferred from custody and removed from the United States "pretty quickly."

After Bonilla's counsel's presentation, the members of the Board spoke about Bonilla. Three Board members recognized that Bonilla had shown some great improvement over the past year and a half. Board members also agreed that he could benefit from SOTP and TFC. But Board members expressed concern about Bonilla's high security level at the Iowa

State Penitentiary in Fort Madison. The chair of the Board contrasted Bonilla with other juvenile offenders convicted of class "A" felonies, noting, "The big difference between them and Mr. Bonilla is quite frankly that institutional disciplinary record. Those individuals did not have as lengthy of an institutional disciplinary record in the immediate past as Mr. Bonilla has."

At the conclusion of the review, the Board voted to deny Bonilla parole. The chair declared that they would "like to see him complete treatment" and "continued good behavior." A formal written denial followed the same day.

On August 24, the Board issued the following ruling concerning Bonilla's nine motions:

> Offender Bonilla has appealed the Board's refusal to rule upon the "motions" Attorney Angela L. Campbell filed on his behalf on June 17, 2016. The Board's parole eligibility reviews are not adversarial proceedings and the Board does not engage in motion practice during such reviews. No formal ruling is required nor will be made concerning these filings. Offender Bonilla's motions were logged by the Board as correspondence in support of release and were considered by the Board during its release deliberations.
>
> . . . . Following the Board's public deliberations, Offender Bonilla was denied release (F-7). The Board sent Offender Bonilla written notice of the Board's denial ruling and its reasoning. Offender Bonilla did not appeal the Board's July 28, 2016 F-7 denial order.
>
> Although Offender Bonilla may have originally questioned the validity of the Board's case file review procedures, he has not timely challenged the resulting denial decision. Accordingly, the procedural deficiencies Offender Bonilla complains of through the above-referenced filings have now been mooted through the Board's conduct of its June 28, 2016 case file review and/or his failure to appeal the Board's July 28, 2016 F-7 denial order.

Bonilla filed a petition for judicial review on September 14, pursuant to Iowa Code section 17A.19. He challenged the Board's parole review

practices and regulations as violating article I, sections 9, 10, and 17 of the Iowa Constitution and the Eighth and Fourteenth Amendments to the Federal Constitution.

The Board filed a motion to dismiss on October 6. In the motion to dismiss, the Board argued that Bonilla had not alleged substantial rights were affected by any claimed error, and therefore any error was harmless. The Board emphasized that Bonilla unequivocally stated he was not challenging the outcome of any particular parole release decision conducted by the Board. The district court denied the motion to dismiss on January 5, 2017.

Bonilla's next annual parole review took place on July 27, and was made part of the administrative record in this case. It lasted approximately twenty minutes and was transcribed. Bonilla's counsel was invited to attend but did not appear, apparently because of a scheduling conflict. At the outset of the review, the chair remarked,

> As we're moving forward considering these cases, Board members, I do want to caution you as I always do to make sure that we are cognizant of the factors that we are to consider when looking at this special blend of cases that being these that we've deemed the juvenile lifers. Our Supreme Court has determined that life without parole is rare, or should be rare and uncommon, for those such as Mr. Bonilla who commit a class A offense as a juvenile. As the Board we should be looking toward an eventual release for these individuals. . . . Now when we're considering these individuals, I want you to look at—and you should be looking at—not as much the crime that they committed, other than to figure out where they've started, but what they've done since they've come to prison and how they've shown that they've been rehabilitated over the long term period of their incarceration . . . .

The Board proceeded to discuss Bonilla. One member noted Bonilla had completed TFC but had not yet received SOTP, which he needed. There was recognition Bonilla is "moving in the right direction." Concern

was expressed over Bonilla's history of major disciplinary reports in prison for activities that would be criminal even "on the outside." One Board member noted that "a lot of the criminal activity [in prison had occurred] after his twenty-fifth birthday." As he put it, "[W]e're looking at an individual here who's been really good over the last not quite three years . . . ." This member concluded, "[T]wenty-five percent of your prison time being good . . . isn't sufficient enough for me [to vote for release]." The Board again voted to deny parole.

On August 2, the chair of the Board wrote the Warden of the Iowa State Penitentiary concerning the Board's decision to deny parole. The letter spoke about Bonilla's positive accomplishments in prison and added,

> He has had no disciplinary reports since his last review but has a significant history of gang related and gambling reports spanning nearly ten years while incarcerated. For this reason, the Board needs to see a longer period of institutional adjustment before gradual release can be endorsed. This statement should not be construed as the Board forbidding movement. Any decision to move Bonilla from [the Iowa State Penitentiary] to a lower security level facility will be left to the discretion of the Department of Corrections . . . .

> The Board requests that Bonilla complete the Sex Offender Treatment Program recommended by the Department, Life Skills and job training before he begins gradual release. Bonilla may be placed on the waiting lists for any and all programming for which he is classified. The Board is not requesting that he be given priority over others who are already on the applicable waiting lists. Completion of all recommended treatment programs does not mean Bonilla will be granted a release. Completion of treatment is only one of several factors considered by the Board. The Board may request programming not recommended by the Department.

> The Board is encouraged by Bonilla's recent positive efforts and he is encouraged to continue to maintain a positive outlook and perspective while completing programming. Positive effort, behavior, and attitude [are] a significant indicator of an individual's future willingness and ability to be a law-abiding citizen.

> In the Board's opinion, Bonilla has yet to demonstrate through his actions sufficient lasting rehabilitation and maturity to

assure the Board there is a reasonable probability that he is willing and able to fulfill the obligation[s] for a law-abiding citizen. The Board voted unanimously to deny parole for one year. Bonilla will be reviewed again at his next annual.

A copy of this letter will be forwarded to Bonilla, but please feel free to share it with him[.]

On March 14, 2018, the district court denied the petition for judicial review on the merits and dismissed the action. At the outset, the district court declined to disturb its prior ruling on the Board's motion to dismiss. Turning to the merits, the district court canvassed recent cases involving juvenile sentencing. The district court concluded that there was no reason to believe the Board would fail to follow the applicable law in considering parole. The district court recognized that in *Greiman v. Hodges*, 79 F. Supp. 3d 933, 944–45 (S.D. Iowa 2015), a federal district court declined to grant a motion to dismiss filed by the Board challenging a failure to release the prisoner. The district court emphasized that the value of *Greiman* as precedent was reduced because the federal court had to assume the facts as pleaded were true—namely, that parole was denied solely as a result of the nature of the offense. *See id.* at 936.

The district court also considered *Diatchenko v. District Attorney*, 27 N.E.3d 349 (Mass. 2015). In *Diatchenko,* the district court noted, the Massachusetts Supreme Judicial Court found a right to counsel, at state expense, under the Massachusetts Constitution for juveniles sentenced to life in prison for homicide offenses. *Id.* at 361. The district court concluded there was nothing in Iowa precedent to suggest a likelihood that the Iowa Supreme Court would come to a similar conclusion under the Iowa Constitution. Further, the district court concluded that in a parole determination, the mitigating attributions of youth are no longer the essential consideration. Instead, according to the district court, the

offender's "actual behavior" is most pertinent. The district court concluded,

> [T]here is no authority compelling the concluding that the matters requested in Bonilla's nine motions to the Board are constitutionally mandated and there is no basis on this record to conclude that the current statutory and regulatory parole system in Iowa, on its face, denies juvenile offenders a meaningful opportunity for release.

The district court denied the petition for judicial review. Bonilla filed a timely appeal. We retained the appeal.

**II.  Standard of Review.**

In attacking the action of the Board, Bonilla cited a number of provisions of the Iowa Administrative Procedures Act in his petition for judicial review before the district court. Constitutional issues raised in agency proceedings are reviewed de novo. Iowa Code § 17A.19(10)(*a*); *Gartner v. Iowa Dep't of Pub. Health*, 830 N.W.2d 335, 344 (Iowa 2013). We review the district court's ruling on a petition for judicial review for correction of errors at law with respect to challenges to interpretations of law not clearly vested in the agency, challenges to final agency action on procedural or process grounds, and claims that the agency did not consider a relevant and important matter. Iowa Code § 17A.19(10)(*c*), (*d*), (*j*); *Greenwood Manor v. Iowa Dep't of Pub. Health*, 641 N.W.2d 823, 830 (Iowa 2002). Bonilla also claims a violation of Iowa Code section 17A.19(10)(*n*), which provides for reversal of agency action in a contested case that is "arbitrary, capricious, or an abuse of discretion," which we also review for errors at law. *Greenwood*, 641 N.W.2d at 830.

**III.  Preliminary Issues.**

**A.  Whether Bonilla Satisfies the Prejudice Requirement in Iowa Code Section 17A.19(8), (10).**  A person seeking judicial review of agency action under Iowa Code section 17A.19(10) must demonstrate prejudice

from the agency action. Specifically, a court shall grant relief from agency action "if it determines that substantial rights of the person seeking judicial relief have been prejudiced because the agency action is" invalid for any of fourteen enumerated reasons. *Id.* "The burden of demonstrating the required prejudice and the invalidity of agency action is on the party asserting invalidity." *Id.* § 17A.19(8)(*a*).

The parties dispute whether the required showing of prejudice is a question of standing or analogous to a harmless error rule. The Board contends that the prejudice requirement is analogous to a harmless error rule. In contrast, Bonilla contends that the prejudice requirement is a question of standing. The district court adopted Bonilla's view.

The Board is correct that the prejudice requirement is a harmless error rule. In our leading case on the prejudice requirement, we said,

> [T]he "substantial rights" language of s 17A.19(8) has no bearing on a person or party's standing to obtain judicial review. It is, instead, merely a provision analogous to a harmless error rule. It is a direction to the court that an agency's action should not be tampered with unless the complaining party has in fact been harmed.

*City of Des Moines v. Pub. Emp't Relations Bd.*, 275 N.W.2d 753, 759 (Iowa 1979).

The question then becomes whether Bonilla can meet his burden to show prejudice. The Board argues he cannot. The Board first observes that Bonilla failed to appeal his parole denials. Building on that observation, the Board contends, "Bonilla necessarily concedes that the Board arrived at a correct result regardless of any deficient review procedures." Consequently, the Board says, Bonilla is unable to show prejudice.

Bonilla counters that he "suffered and continues to suffer harm to his constitutional rights resulting from the Board's failure to consider and

failure to provide the nine safeguards he sought during his parole review process." The failure to consider and provide the safeguards, Bonilla continues, "resulted in violations of his own and other parole-eligible juvenile offenders' constitutional right to a review process that afforded them a realistic and meaningful opportunity to be released on parole." Bonilla notes that a federal district court in Iowa denied a motion to dismiss similar claims. *Greiman*, 79 F. Supp. 3d at 944–45. Bonilla also points to a decision of the Massachusetts Supreme Judicial Court considering constitutional due process claims not in the context of a parole denial. *Diatchenko*, 27 N.E.3d at 353–54.

Our leading case on the prejudice requirement in section 17A.19 is *City of Des Moines*, 275 N.W.2d at 759. In this case, we reviewed a petition for declaratory order filed by the city with the Public Employment Relations Board (PERB). *Id.* at 755. The city asked PERB if, under a specified hypothetical fact pattern, the timetables and other aspects of the Public Employment Relations Act allowed PERB to consider a request for binding arbitration from an employee organization where the public employer does not join the request. *Id.* at 756. PERB issued a ruling adverse to the city, the city sought judicial review, the district court disagreed with PERB, PERB appealed, and we agreed with the district court. *Id.*

Before reaching our ultimate conclusion in *City of Des Moines*, we considered the preliminary question on whether the city had standing. *Id.* at 759. We said it did because the city's position as a public employer demonstrated a specific personal and legal interest in the subject matter of the decision, while "the fact that it will be involved in future negotiations affected by the decision of [PERB] in this matter establishes that its interest has been specially and injuriously affected." *Id.*

We then turned to the prejudice requirement in Iowa Code section 17A.19. *Id.* We said, "The city's future recurring involvement in contract negotiations also serves to meet this requirement." *Id.*

We find Bonilla's argument persuasive in light of *City of Des Moines*. Like the city, Bonilla will have "future recurring involvement" in parole proceedings. *See id.* The agency actions challenged by both Bonilla and the city were denials of requested relief concerning the process for the future proceedings or negotiations. As such, *City of Des Moines* teaches, contrary to the Board's assertion, that Bonilla can show prejudice even though his petition is not based on appeal of the parole denial.

Bonilla's argument for prejudice turns on his claim that he "suffered and continues to suffer harm to his constitutional rights" to due process. Might these constitutional harms be enough to show prejudice under section 17A.19? We think the answer is a clear yes. As a result, dismissal is not appropriate without analysis of the merits of the underlying constitutional claims.

**B. Whether Both Facial and As-Applied Challenges Are Before Us.** A constitutional challenge may be facial or as-applied. *See Honomichl v. Valley View Swine, LLC*, 914 N.W.2d 223, 231 (Iowa 2018). "A facial challenge is one in which no application of the statute could be constitutional under any set of facts." *Id. But see Janklow v. Planned Parenthood, Sioux Falls Clinic*, 517 U.S. 1174, 1175, 116 S. Ct. 1582, 1583 (1996) (mem.) (Stevens, J.) (explaining that the "no set of circumstances" test is inconsistent with the standard for deciding facial challenges and with a wide array of legal principles (quoting *United States v. Salerno*, 481 U.S. 739, 745, 107 S. Ct. 2095, 2100 (1987))). By contrast, "an as-applied challenge alleges the statute is unconstitutional as applied to a particular set of facts." *Honomichl*, 914 N.W.2d at 231. We have joined other courts

and commentators in recognizing that "[t]he distinction between the two types of challenges appears simple enough, yet it is unclear and 'more illusory than the ready familiarity of the terms suggests.' " *Id.* (quoting Gillian E. Metzger, *Facial Challenges and Federalism*, 105 Colum. L. Rev. 873, 880 (2005)); *see* Alex Kreit, *Making Sense of Facial and As-Applied Challenges*, 18 Wm. & Mary Bill Rts. J. 657, 658 (2010).

The Board argues that only a facial challenge is presented for our review. The Board concedes that Bonilla exhausted administrative remedies and preserved error on his facial challenge. In any case, the Board notes, exhaustion of administrative remedies is not required where a petitioner is solely challenging the facial constitutional validity of a statute under which an agency is proceeding. *See Tindal v. Norman*, 427 N.W.2d 871, 872–73 (Iowa 1988).

But, in a multipronged attack, the Board contends that Bonilla's as-applied challenges are not presented for our review. First, the Board says, "Timely exhaustion of the Board's administrative appeal process and specific presentation of an alleged error is required before a court acquires authority to hear that claim on judicial review." In support, the Board points to *Ghost Player, L.L.C. v. State*, 860 N.W.2d 323, 326 (Iowa 2015). The as-applied challenges are not before us, the Board continues, because Bonilla's administrative appeal only addressed the Board's failure to enter a ruling on his nine procedural motions and predated the 2016 parole denial. Further, the Board argues, "Bonilla has not appealed the Board's conduct of any specific parole review or the results thereof through the Board's administrative appeal process."

Alternatively, the Board argues that Bonilla was required to move to expand the district court's ruling through an Iowa Rule of Civil Procedure 1.904(2) motion to preserve error on the as-applied claims. *See Meier v.*

*Senecaut*, 641 N.W.2d 532, 537–39 (Iowa 2002). According to the Board, and quoting part of the district court's order, "[T]he District Court's ruling was limited solely to answering whether 'the current statutory and regulatory parole system in Iowa, on its face, denies juvenile offenders a meaningful opportunity for release.' "

Bonilla rejects the Board's arguments. On the exhaustion issue, he notes that the Board stated there was no motion practice before the Board within the context of parole release deliberations and subsequently refused to consider all nine of the pending motions. After he appealed that response pursuant to Iowa Administrative Code Rule 205—15.1(17A) (2015), Bonilla points out, that the Board replied that the motions were moot in light of his failure to appeal the parole denial. This, Bonilla, says, was final agency action on the motions.

Bonilla further argues that his case fits within the exception to the exhaustion requirement for situations "when the administrative remedy is inadequate or its pursuit would be fruitless." *Riley v. Boxa*, 542 N.W.2d 519, 521 (Iowa 1996) (quoting *Alberhasky v. City of Iowa City*, 433 N.W.2d 693, 695 (Iowa 1988)). The exception applies here, Bonilla contends, because the Board notified him during the proceedings below, and maintains on appeal, that his motions were inapposite to parole reviews and would merely be considered correspondence.

Finally, Bonilla argues he was not required to file a rule 1.904(2) motion after the district court's denial of his petition for judicial review. He contends the district court did not limit its decision to a facial or an as-applied challenge to the constitutionality of the Board's procedures. In support, Bonilla quotes a larger portion of the same language relied on by the Board:

In conclusion, there is no authority compelling the concluding that the matters requested in Bonilla's nine motions to the Board are constitutionally mandated and there is no basis on this record to conclude that the current statutory and regulatory parole system in Iowa, on its face, denies juvenile offenders a meaningful opportunity for release.

We first address the issue of exhaustion. "All administrative remedies must be exhausted before an aggrieved party is entitled to judicial review of an administrative decision." *Riley*, 542 N.W.2d at 521. "Two conditions must be met before we apply the doctrine: an adequate administrative remedy must exist for the claimed wrong, and the governing statutes must expressly or impliedly require the remedy to be exhausted before allowing judicial review." *Id.* "An exception to the doctrine 'is applied when the administrative remedy is inadequate or its pursuit would be fruitless.'" *Id.* (quoting *Alberhasky*, 433 N.W.2d at 695). For instance, facial challenges to the validity of a statute are excepted from the exhaustion requirement because agencies cannot decide issues of statutory validity. *Tindal*, 427 N.W.2d at 872–73. Additionally, there is an exception to the exhaustion requirement for a clear showing of substantial dimension that "irreparable injury resulting from following the administrative process would make judicial review of final agency action an inadequate remedy." *Riley*, 542 N.W.2d at 522 (quoting *Salsbury Labs. v. Iowa Dep't of Envtl. Quality*, 276 N.W.2d 830, 837 (Iowa 1979)).

We think the exhaustion requirement does not bar Bonilla's as-applied challenges. The Board is correct that, by making his motions and administratively appealing prior to the parole denial, the motions could not have been considered by the Board in the factual context presented by Bonilla's case. As such, unless an exception applies, the as-applied challenges fail the exhaustion requirement. However, we think an exception applies here. As Bonilla points out, the Board repeatedly took

the position that it would not, and does not, consider such motions in parole review proceedings. The motions were docketed as mere correspondence. Thus, the parole review process is an inadequate remedy. *See id.* at 521.

We now turn to the question of whether Bonilla was required to file a rule 1.904(2) motion to preserve his as-applied constitutional challenges. We think it clear that Bonilla presented as-applied challenges to the district court. Yet, the district court's order gives no reason to think that it "considered the issue and necessarily ruled on it." *Lamasters v. State*, 821 N.W.2d 856, 864 (Iowa 2012). The district court order focuses on discussing generally the impacts of recent federal and state jurisprudence on parole opportunities for persons convicted of crimes committed as juveniles. Nothing in the court's order relates to Bonilla's specific circumstances. Further, the district court clearly states that its decision pertains to "the current statutory and regulatory parole system in Iowa, on its face." Consequently, Bonilla was required to file a rule 1.904(2) motion concerning his as-applied challenges. Because he did not do so, his as-applied challenges are not preserved.

**C. Nature of Facial Challenge.** We now proceed to examine Bonilla's facial challenges. His facial challenges claim that various standards and procedures are unconstitutional as to all juvenile offenders. He has not appealed the denial of parole at his various annual reviews and does not seek reversal of those denials.

To succeed on a facial challenge, the challenger must show that a statute is "totally invalid and therefore, 'incapable of *any valid application.*' " *Santi v. Santi*, 633 N.W.2d 312, 316 (Iowa 2001) (emphasis added) (quoting *State v. Brumage*, 435 N.W.2d 337, 342 (Iowa 1989)). We have said a facial challenge to a statute "is 'the most difficult . . . to mount

successfully' because it requires the challenger to show the statute under scrutiny is unconstitutional *in all its applications.*" *Honomichl*, 914 N.W.2d at 231 (emphasis added) (quoting *Salerno*, 481 U.S. at 745, 107 S. Ct. at 2100). For example, in a facial challenge to a statute requiring payment of restitution in order to obtain expungement of a criminal offense, we recently emphasized that the absence of a finding as to the plaintiff's ability to pay was irrelevant to her facial challenge. *State v. Doe*, 927 N.W.2d 656, 661 (Iowa 2019).

The above line of cases stated that facts are irrelevant in a facial challenge. Here, Bonilla is not challenging the denial of parole in his annual reviews. He has not appealed the denial of parole in any annual review based on any of the grounds asserted in his petition in this case. Our task is not to consider retrospectively whether Bonilla was entitled to any of the procedural rights he claims he is due in the context of his past annual reviews.

Rather, Bonilla has presented us in this case only with a prospective, anticipatory attack. He claims that he will have annual reviews in the future and that he is entitled to a ruling, in advance of these future hearings, on whether the procedures offered by the Board are facially unconstitutional.

Yet, we have also sometimes taken a somewhat different approach. For example, we have stated that "[i]f a statute is constitutional as applied to a defendant, the defendant cannot make a facial challenge unless a recognized exception to the standing requirement applies." *City of Sioux City v. Jacobsma*, 862 N.W.2d 335, 346 (Iowa 2015) (alteration in original) (quoting *State v. Robinson*, 618 N.W.2d 306, 311 n.1 (Iowa 2000) (en banc)); *see also State v. Ortiz*, 905 N.W.2d 174, 184 (Iowa 2017). If we applied this approach here, the question would be whether Bonilla has

demonstrated that *in his future annual reviews*, his rights to due process are being threatened by a facially invalid statute, regulation, or policy.

As will be seen below, under either approach to a facial challenge, Bonilla fails to show he is entitled to relief.

**IV. Discussion.**

**A. Overview.** In this case, Bonilla challenges both the substance and the procedures employed by the Board in determining parole eligibility for juvenile offenders who have been sentenced to life in prison with the possibility of parole. He raises three separate but overlapping constitutional claims based upon the cruel and unusual punishment clauses of the Federal and Iowa Constitutions, U.S. Const. amend. VIII; Iowa Const. art. I, § 17, the due process clauses of the Federal and Iowa Constitutions, U.S. Const. amend. XIV; Iowa Const. art. I, § 9, and the right to counsel clause under the Iowa Constitution, Iowa Const. art. I, § 10. All constitutional challenges arise in the context of the recent cruel and unusual punishment cases of both the United States Supreme Court and this court invalidating mandatory prison sentences without possibility of parole for offenders who are juveniles when they commit their crime or crimes. *See Montgomery v. Louisiana*, 577 U.S. ___, ___, 136 S. Ct. 718, 732 (2016); *Miller v. Alabama*, 567 U.S. 460, 479, 132 S. Ct. 2455, 2469 (2012); *Graham*, 560 U.S. at 75, 130 S. Ct. at 2030; *Roper v. Simmons*, 543 U.S. 551, 569–73, 125 S. Ct. 1183, 1195–97 (2005); *State v. Sweet*, 879 N.W.2d 811, 832 (Iowa 2016); *State v. Seats*, 865 N.W.2d 545, 555 (Iowa 2015); *State v. Lyle*, 854 N.W.2d 378, 400 (Iowa 2014); *State v. Ragland*, 836 N.W.2d 107, 119, 122 (Iowa 2013); *State v. Null*, 836 N.W.2d 41, 74 (Iowa 2013). These cases generally stand for the proposition that a juvenile under a life sentence is entitled to a "meaningful opportunity to obtain

release based on demonstrated maturity and rehabilitation." *Graham*, 560 U.S. at 75, 130 S. Ct. at 2030.

First, we consider Bonilla's claim that the statutory and regulatory provisions governing the manner in which the Board approaches the question of whether a juvenile should be released on parole are inconsistent with the juvenile cruel and unusual punishment cases of this court and the United States Supreme Court. This substantive challenge raises a straightforward preliminary issue: is mere eligibility for parole like any other adult sufficient to satisfy the requirement that a juvenile offender be provided with a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation" or is more required? If eligibility for parole like any other adult is sufficient, that is the end of the matter. If, however, more is required, the question arises whether the statutes and rules governing the Board's consideration of parole for juvenile offenders may be interpreted in a fashion to pass constitutional muster.

Second, we address Bonilla's multipronged claim that, in applying the applicable standards under the state and federal caselaw, he is entitled to the procedural rights sought in his motions before the Board and litigated before the district court in his appeal of the Board's action. In addressing this second set of procedural issues, we are required to determine whether Bonilla has a "liberty interest" in parole that triggers traditional due process protections. If there are no due process protections, any right to procedures has to be based solely on the cruel and unusual punishment claim. But if the cruel and unusual punishment cases only require eligibility for parole, there may be no procedural rights arising from the cruel and unusual punishment clause itself. On the other hand, if the cruel and unusual punishment claim involves more substance

than mere eligibility for parole, and if a liberty interest is present, Bonilla will be constitutionally entitled to adequate procedures that give him a meaningful opportunity to demonstrate maturity and rehabilitation that would entitled him to release.

In considering these issues, we are mindful that Bonilla raises claims under both the Federal and Iowa Constitutions. The interpretations of the Federal Constitution by the United States Supreme Court, of course, are binding upon us in the interpretation of the Federal Constitution, but we are free to develop our own independent approach to constitutional protections under the Iowa Constitution. *See State v. Oliver*, 812 N.W.2d 636, 650 (Iowa 2012).

**B. The Statutory and Regulatory Parole Framework and the Substantive Constitutional Requirement under *Graham–Miller* of a "Meaningful Opportunity to Obtain Release Based on Demonstrated Maturity and Rehabilitation."**

1. *Introduction.* In order to consider Bonilla's substantive claim, we first explore the statutory and regulatory environment in Iowa for parole consideration. Second, we provide a brief summary of the positions of the parties to provide context. Third, we consider the substantive requirements of "a meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation" under the Federal and Iowa Constitutions and compare that with the existing statutory and legal parole framework to determine if the framework on its face violates the substantive constitutional requirements under *Graham–Miller*.[2]

2. *Statutory and regulatory framework of parole and work release.* Iowa Code chapter 906 generally addresses parole and work release. The

---

[2]For convenience, we refer to the collective developments in cruel and unusual punishment law as applied to juveniles as *Graham–Miller* principles.

Board is given the general authority to adopt rules regarding a system of parole. Iowa Code § 906.3. The Board is required to conduct "at least annual[]" reviews of each parole-eligible offender. *Id.* § 906.5(1)(*a*).

The Board is to "consult with the director of the department of corrections on rules regarding a system of work release and shall assist in the direction, control, and supervision of the work release system." *Id.* § 906.3. The Board is given the authority to determine which persons in the custody of the department of corrections should be released on parole or work release. *Id.* "The grant or denial of parole or work release" is declared "not a contested case as defined in" the Iowa Administrative Procedures Act, Iowa Code section 17A.2. *Id.* § 906.3.

Iowa Code section 906.4(1) establishes a standard for release on parole or work release. Under the statutory provision,

> The board shall release on parole or work release any person whom it has the power to so release, when in its opinion there is reasonable probability that the person can be released without detriment to the community or to the person. A person's release is not a detriment to the community or the person if the person is able and willing to fulfill the obligations of a law-abiding citizen, in the board's determination.

*Id.*

Iowa Code section 906.5(1)(*a*) directs the Board to establish and implement a plan for systematic review of the status of each prisoner and for consideration of the person's prospects for parole or work release. Iowa Code section 906.5(1)(*b*) provides that if the Board conducts a hearing at which a person in custody will be interviewed, the Board shall notify the department of corrections, which will, absent certain exceptions, make the person available for the interview at the person's institutional residence.

Iowa Code section 906.5(3) relates to information considered when the Board conducts a review of the status of a committed person. According to this code section,

> At the time of a review . . . the board shall consider all pertinent information regarding the person, including the circumstances of the person's offense, any presentence report which is available, the previous social history and criminal record of the person, the person's conduct, work, and attitude in prison, and the reports of physical and mental examinations that have been made.

*Id.*

Iowa Code section 906.7 addresses the question of information from other sources. Under this provision, "The board shall not be required to hear oral statements or arguments either by attorneys or other persons." *Id.* To the extent the Board allows such statements, persons presenting the statements "shall submit . . . an affidavit stating whether any fee has been paid or is to be paid for their services in the case, and by whom such fee is paid or to be paid." *Id.*

The Board has enacted rules that implement its statutory authority. Iowa Admin. Code ch. 205. The rules promulgated by the Board do not require that a person be given advance notice of an annual review; rather, the rules only require that notice be provided if the person is to be interviewed. *Id.* r. 205—8.8. Nonetheless, the rules provide that "[t]he board shall normally consider only information that has been reviewed by the inmate," except where such inmate review is not feasible because of the need to protect confidential sources. *Id.* r. 205—8.11. Information in inmate reports is "structured so as to separate opinion from factual information." *Id.* r. 205—8.11(3). Opinion information is deemed confidential, as are psychiatric or psychological test results and diagnoses. *Id.* If an inmate is, in the Board's discretion, interviewed, the Board is

required to give the inmate "ample opportunity to express views and present materials." *Id.* r. 205—8.12.

Two rules address the question of the information that may be considered by the Board. "The board or board panel may consider the inmate's records and other information with respect to history, current situation, parole and work release prospects, and other pertinent matters." *Id.* r. 205—8.13.

The rules further provide that the Board "may consider" a laundry list of factors and "others deemed relevant to the parole and work release decisions." *Id.* r. 205—8.10(1). The laundry list of factors are:

*a.* Previous criminal record;

*b.* Nature and circumstances of the offense;

*c.* Recidivism record;

*d.* Convictions or behavior indicating a propensity for violence;

*e.* Participation in institutional programs, including academic and vocational training;

*f.* Psychiatric and psychological evaluations;

*g.* Length of time served;

*h.* Evidence of serious or habitual institutional misconduct;

*i.* Success or failure while on probation;

*j.* Prior parole or work release history;

*k.* Prior refusal to accept parole or work release;

*l.* History of drug or alcohol use;

*m.* A parole plan formulated by the inmate;

*n.* General attitude and behavior while incarcerated;

*o.* Risk assessment.

*Id.*

3. *Positions of the parties.* Bonilla challenges the notion that the above statutory and regulatory provisions, which apply generally to all persons in custody and do not focus on juvenile offenders, are constitutionally adequate under recent caselaw. Specifically, Bonilla notes that to satisfy the requirements of the Eighth Amendment, states "must provide 'some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.'" *Miller*, 567 U.S. at 479, 132 S. Ct. at 2469 (quoting *Graham*, 560 U.S. at 75, 130 S. Ct. at 2030). According to Bonilla, the Supreme Court in *Montgomery* held that the *Graham–Miller* principles apply equally to sentencing and to parole procedures. 577 U.S. at ___, 136 S. Ct. at 736.

Bonilla claims that the current statutory and regulatory parole regime does not comport with the constitutional requirement under *Graham–Miller* that juveniles who commit crimes be provided with a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Graham*, 560 U.S. at 75, 130 S. Ct. at 2030. Bonilla asserts that the Iowa statutory and regulatory provisions basically allow the Board to consider anything it considers appropriate in determining the issue of parole. Bonilla notes that many of the factors in Iowa Administrative Code rule 205—8.10(1) focus exclusively on the past actions of the inmate, including the original offense, rather than on the current maturity and rehabilitation. The thrust of Bonilla's argument is that because nothing in the statutory or regulatory framework explicitly requires the Board to provide a meaningful opportunity to demonstrate maturity and rehabilitation, the Iowa approach cannot pass constitutional muster.

Further, Bonilla argues that nothing in the regulatory scheme satisfies this court's repeated admonition that the hallmark factors of

youth must be considered in *mitigation* of punishment. *See, e.g., Seats*, 865 N.W.2d at 556 ("The sentencing judge should consider these family and home environment vulnerabilities together with the juvenile's lack of maturity, underdeveloped sense of responsibility, and vulnerability to peer pressure as *mitigating*, not aggravating, factors." (Emphasis added.)); *Lyle*, 854 N.W.2d at 404 n.10 (discussing factors); *Ragland*, 836 N.W.2d at 121 ("*Miller* requires an individualized consideration of youth as a *mitigating* factor at a sentencing hearing . . . ." (Emphasis added.)); *State v. Pearson*, 836 N.W.2d 88, 95 (Iowa 2013) ("[T]he typical characteristics of youth, such as immaturity, impetuosity, and poor risk assessment, are to be regarded as *mitigating* instead of aggravating factors." (Emphasis added.)); *Null*, 836 N.W.2d at 75 ("[T]he typical characteristics of youth . . . are to be regarded as *mitigating*, not aggravating factors." (Emphasis added.)).

Bonilla believes, for purposes of parole, the constitutionally required approach is to adopt a statutory or regulatory framework that differentiates persons who committed offenses as juveniles from other offenders. Bonilla points to statutory provisions in California, Connecticut, and West Virginia that treat parole decisions involving juvenile offenders differently and ensure consideration of release complies with the dictates of *Graham–Miller*. Cal. Penal Code § 4801(c) (West, Westlaw through ch. 5 of 2019 Reg. Sess.) (requiring parole board to "give great weight to the diminished culpability of youth as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity of the prisoner in accordance with relevant case law"); Conn. Gen. Stat. § 54-125a(f)(4) (West, Westlaw through June 18, 2019) (requiring special consideration for juveniles at parole hearings to ensure focus on rehabilitation and maturity and recognition of mitigating factors of youth); W. Va. Code § 62-12-13b(a)–(b) (West, Westlaw through 2019 Reg. Sess.)

(requiring consideration of diminished culpability of juvenile defendants and consideration of any subsequent growth and increased maturity during incarceration).

The Board counters that the statutory and regulatory framework under which it considers persons for release complies with *Graham–Miller*. The Board emphasizes that all that is required under *Graham–Miller* is a reasonable *opportunity* to demonstrate maturity and rehabilitation. The Board emphasizes that the recent caselaw does not guarantee a juvenile offender's actual release on parole. *See State v. Propps*, 897 N.W.2d 91, 101 (Iowa 2017); *Sweet*, 879 N.W.2d at 839; *Seats*, 865 N.W.2d at 557.

The Board further argues that the requirements under *Graham–Miller* are generally subsumed within the statutory and regulatory release criteria. The Board notes, quoting *Sweet*, 879 N.W.2d at 833, "It is through [the] individualized review of each offender's unique circumstances that the Board can account for the fact that 'children are constitutionally different from adults.'" According to the Board, this time quoting *State v. Roby*, 897 N.W.2d 127, 147 (Iowa 2017), through its individualized review it can "observe the truth of and act upon the maxim that 'juveniles are normally more malleable to change and reform in response to available treatment.'" The Board further notes that under the statute and rules, "treatment, education, and exhibited prison conduct and behaviors are exactly the things the Board should be considering" and that such consideration is consistent with the statutory and regulatory framework.

Additionally, the Board states, the open-ended statutory and regulatory parole regime does not dictate in any way the weight to be given to various factors. Thus, the Board contends, it is able to give more weight

to the *Graham–Miller* factors and to discount other factors that have little or no relevance to juvenile offenders.

4. *Consistency of statutory and regulatory parole framework with the requirements under* Graham–Miller. Before we consider whether the Iowa statutory and regulatory framework complies with *Graham–Miller*, we must first understand what *Graham–Miller* requires in terms of the standard to be applied to juvenile offenders seeking release. Once we have established the substance of the *Graham–Miller* standard, we can then determine whether the statutory and regulatory framework can be interpreted in a fashion that embraces the constitutional requirements. The ultimate requirement under *Graham–Miller*, of course, is that the juvenile offender must be given "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Graham*, 560 U.S. at 75, 130 S. Ct. at 2030. The question is what this general requirement means for authorities considering the parole of juvenile offenders. An examination of the briefing in this case reveals agreement by the parties on a number of important *Graham–Miller* propositions.

First, the standard to be applied by parole authorities considering the release of a juvenile offender under *Graham–Miller* is an individualized determination of whether the juvenile offender has "demonstrated maturity and rehabilitation." *Id.* *Graham–Miller* requires a parole board to recognize that the characteristics of youth are transient, that juveniles are more capable of change than adults, and that character formation is complete only when an offender turns about twenty-five years of age. *Miller*, 567 U.S. at 471–73 & n.5, 132 S. Ct. at 2464–65 & n.5; *Graham*, 560 U.S. at 68, 130 S. Ct. at 2026; *Sweet*, 879 N.W.2d at 815–16, 829; *Null*, 836 N.W.2d at 74–75. The focus of *Graham–Miller* is on the dynamic evolving character of the juvenile offender, not on the static characteristic

of the offense. *Miller*, 567 U.S. at 471–73, 132 S. Ct. at 2464–65; *Graham*, 560 U.S. at 68–69, 130 S. Ct. at 2026–27. In considering parole of the juvenile offender under *Graham–Miller*, the Board must recognize, for the above reasons, that "children are different." *Miller*, 567 U.S. at 480, 132 S. Ct. at 2469. The Board does not contest the applicability of these principles to annual reviews conducted by the Board of the juvenile offenders.

Second, the focus of the decision whether to release a juvenile offender on parole under *Graham–Miller* cannot be the heinousness of the underlying offense. *Miller*, 567 U.S. at 471–73, 132 S. Ct. at 2464–65. Indeed, any juvenile who has been waived into adult court has likely committed heinous offenses. Further, from the beginning of the development of its recent application of cruel and unusual punishment concepts to juveniles, the Supreme Court has emphasized that "[a]n unacceptable likelihood exists that the brutality or cold-blooded nature of any particular crime would overpower mitigating arguments based on youth." *Roper*, 543 U.S. at 573, 125 S. Ct. at 1197. As emphasized by Justice Kennedy in plain language, "[C]hildren who commit even heinous crimes are capable of change." *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 736. Thus, even in cases where the juvenile offender has been waived into adult court because of the seriousness of the underlying crime, most offenders are redeemable. Instead of focusing on the underlying crime, parole authorities must focus on the dynamic factors of the development of youth and the high likelihood of maturity and rehabilitation. *Miller*, 567 U.S. at 471–73, 132 S. Ct. at 2464–65; *Graham*, 560 U.S. at 68, 130 S. Ct. at 2026; *Sweet*, 879 N.W.2d at 815–16, 829; *Null*, 836 N.W.2d at 74–75. The Board does not contest these propositions. Indeed, at oral argument, the Board recognized that denying parole based on the heinous nature of

the crime where a juvenile offender demonstrated maturity and rehabilitation would violate *Graham–Miller* principles.

Third, a parole board must provide a "meaningful opportunity" under *Graham–Miller. Graham,* 560 U.S. at 75, 130 S. Ct. at 2030. Parole authorities cannot require the camel to pass through the needle's eye. Indeed, *Graham* specifically rejected the mere possibility of executive clemency as sufficient to satisfy constitutional requirements. *Id.* at 70, 130 S. Ct. at 2027. Were the law otherwise, a recalcitrant parole authority could convert a potentially valid sentence into the functional equivalent of an unconstitutional life without possibility of parole. Parole reviews cannot involve repeated incantations of ritualistic denials. *See* Beth Caldwell, *Creating Meaningful Opportunities for Release:* Graham*,* Miller *and California's Youth Offender Parole Hearings*, 40 N.Y.U. Rev. L. & Soc. Change 245, 285 (2016) [hereinafter Caldwell] (asserting that illusory possibilities of parole do not amount to a realistic opportunity for release under *Graham–Miller*). The Board recognizes that the opportunity to show maturity and rehabilitation must be realistic.

The Board also recognizes that the opportunity for release must be "timely realized." Quoting language in *Null* that "[t]he prospect of geriatric release, if one is to be afforded the opportunity for release at all, does not provide a 'meaningful opportunity' to demonstrate the 'maturity and rehabilitation,' " *Null,* 836 N.W.2d at 71 (quoting *Graham,* 560 U.S. at 75, 130 S. Ct. at 2030), the Board argues, emphasis ours, that it "indisputably plays a part in ensuring that a juvenile offender's 'meaningful opportunity' for release based on demonstrated maturity and rehabilitation *can in fact be timely realized.*"

When comparing the statute and regulatory framework with constitutional requirements, we ordinarily strive to reach an interpretation

that passes constitutional muster. *State v. Iowa Dist. Ct.*, 843 N.W.2d 76, 85 (Iowa 2014) ("The doctrine of constitutional avoidance suggests the proper course in the construction of a statute may be to steer clear of 'constitutional shoals' when possible."); *Simmons v. State Pub. Def.*, 791 N.W.2d 69, 74 (Iowa 2010) ("If fairly possible, a statute will be construed to avoid doubt as to constitutionality.").

Applying the principle of constitutional avoidance, we see nothing in the statute or regulations that prevents the Board from applying each of the *Graham–Miller* constitutional principles listed above. The statutes and rules are open-ended and can be interpreted and applied in a fashion consistent with *Graham–Miller*.

For example, the language in Iowa Code section 906.4(1) directing the Board to release a person on parole or work release "when in its opinion there is reasonable probability that the person can be released without detriment to the community or to the person" can be interpreted to require release when a juvenile offender demonstrates maturity and rehabilitation. While Iowa Code section 906.5(3) provides that the Board shall consider "the circumstances of the person's offense," in the case of a juvenile offender, considering the circumstances of the offense is appropriate as a baseline to determine the degree of maturity and rehabilitation attained by the offender but the heinousness of the offense cannot be a barrier to release. Thus, like Iowa Code section 906.4(1), the provisions of Iowa Code section 906.5(3) can be interpreted in a fashion to satisfy the constitutional commands of *Graham–Miller*.

It is true that Iowa Code section 906.5(3) does not specifically embrace *Graham–Miller* principles that the transient features of youth reduce culpability for crimes and that the heinous nature of a crime must not be allowed to overwhelm the parole release decision. But as suggested

by the Board, the open-ended nature of the statutory and regulatory criteria may be interpreted and applied in a manner consistent with the constitutional requirements imposed by *Graham–Miller.*

As the chair of the Board has observed,

> [T]he most important thing when we're reviewing these cases [concerning juvenile offenders sentenced to mandatory imprisonment terms] isn't the crime they've committed, it's what they've done since then. And are they showing us that they have been rehabilitated to a point where they can be released to the community.

Indeed, Bonilla's case involves a clearly heinous crime, which can only be described as simply awful. His crime was extremely serious. Bonilla appears to have been a direct participant. The criminal act extended over a period of hours. No one can doubt the traumatic impact of the crime on the victim. In participating in a heinous crime, Bonilla has much in common with many juvenile offenders sentenced to life in prison in Iowa and with the criminal defendants in *Graham* and *Miller.*

But notwithstanding the heinous crime, and consistent with *Graham–Miller*, even juvenile offenders like Bonilla are entitled to a meaningful opportunity to show maturity and rehabilitation. The record developed at Bonilla's annual reviews demonstrates the Board recognizes Bonilla's recent outstanding record in prison and completion of at least some of the rehabilitation programs the Board has required, and the Board has moved Bonilla closer to a gradual release scenario under the applicable statutes and rules.

Ultimate release, of course, in not assured, but annual reviews in Bonilla's case collectively amount to Exhibit A in demonstrating that the Board is capable of giving meaning to *Graham–Miller* within the open-ended statutory and regulatory framework. As noted in *State v. Zarate*, "the statute's failure to explicitly state that these factors [*Graham–Miller*

factors] must be treated as mitigating does not render the sentencing factors unconstitutional." 908 N.W.2d 831, 854 (Iowa 2018). Indeed, the entire laundry list of factors to be considered under the Board's rules may be viewed, in the case of a juvenile offender, through the *Graham–Miller* lens. *See* Iowa Admin. Code r. 205—8.10(1).

Further, the mere fact that the Board considers the nature of the offense as suggested by the statute and rules does not mean that such consideration is contrary to *Graham–Miller*. For instance, the nature of the offense establishes a baseline to measure rehabilitation. The Board may well consider the nature of the offense when determining that a juvenile offender, before gradual release is considered, must successfully complete a sexual offender treatment program.

We therefore conclude that, as argued by the Board, the statute and rules governing the Iowa parole process can be applied in a constitutional manner if the Board incorporates into its parole review the *Graham–Miller* lodestar of "demonstrated maturity and rehabilitation," does not unduly emphasize the heinous nature of the crime, and provides a meaningful opportunity to demonstrate maturity and rehabilitation. In short, the *Graham–Miller* requirement that we recognize that "children are different" can be satisfied by a conscientious parole board by applying the statute and rules through the constitutionally required *Graham–Miller* lens. *See Miller*, 567 U.S. at 480, 132 S. Ct. at 2469.

**C. Procedural Requirements to Provide a "Meaningful Opportunity to Obtain Release Based on Demonstrated Maturity and Rehabilitation."**

1. *Introduction.* We next turn to the question of whether the Board's procedures provide juvenile offenders with a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation."

*Graham*, 560 U.S. at 75, 130 S. Ct. at 2030. Bonilla makes two related constitutional claims. First, Bonilla claims, because he is entitled to a "meaningful opportunity" to demonstrate maturity and rehabilitation under *Graham–Miller*, the procedural shortcomings of the Board's process violate the cruel and unusual punishment clauses of article I, section 17 of the Iowa Constitution and the Eighth Amendment to the Federal Constitution. Second, Bonilla claims that the procedural defects he has identified violate due process of law under article I, section 9 of the Iowa Constitution and the Fourteenth Amendment to the Federal Constitution.

A threshold question for purposes of due process is whether a juvenile offender has a liberty interest in the *Graham–Miller* requirement that the offender be provided a meaningful opportunity to demonstrate maturity and rehabilitation. If there is a liberty interest, a juvenile offender is entitled to due process in asserting that interest. The question would then arise as to what procedures are required to adequately balance the interest of the juvenile offender and the interests of the state in the parole context. *See Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 903 (1976); *Bowers v. Polk Cty. Bd. of Supervisors*, 638 N.W.2d 682, 691 (Iowa 2002).

2. *Meaningful opportunity of parole as liberty interest.* On the threshold due process question of whether *Graham–Miller* creates a constitutionally based liberty interest, Bonilla asserts the answer is yes. In support of his argument, Bonilla cites the recent federal district court case of *Greiman*, 79 F. Supp. 3d at 945. In *Greiman*, the federal district court explained that *Graham–Miller* creates an interest sufficient to trigger due process protections. *Id.* The *Greiman* court distinguished a juvenile offender case from another case involving an adult offender, *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 99 S. Ct. 2100 (1979).

79 F. Supp. 3d at 945.  In *Greenholtz,* a sharply divided Supreme Court held there was no constitutionally based liberty interest triggering due process rights where parole is based on the "mere hope" of release.  442 U.S. at 11, 99 S. Ct. at 2105.[3]  In distinguishing *Greenholtz,* the *Greiman* court stated,

> [A]lthough *Graham* stops short of guaranteeing parole, it does provide the juvenile offender with substantially more than a *possibility* of parole or a "mere hope" of parole; it creates a categorical entitlement to "demonstrate maturity and reform," to show that "he is fit to rejoin society," and to have a "meaningful opportunity for release."

79 F. Supp. 3d at 945 (quoting *Graham,* 560 U.S. at 79, 130 S. Ct. at 2032–33).

Although *Graham–Miller* does not establish the exact nature of the due process protections required to provide a "meaningful opportunity" to demonstrate maturity and rehabilitation, Bonilla argues that under *Mathews,* 424 U.S. at 335, 96 S. Ct. at 903, he is entitled to procedural protections appropriate in light of the demands of the particular situation.

In contrast, the Board suggests mere eligibility for parole is good enough to satisfy any Eighth Amendment or due process concerns.  The

---

[3]Four members of the *Greenholtz* court dissented from the holding of the majority that a constitutionally based liberty interest did not arise in the parole context.  442 U.S. at 18, 99 S. Ct. at 2109 (Powell, J., concurring in part and dissenting in part); 442 U.S. at 22, 99 S. Ct. at 2111 (Marshall, J., dissenting in part).  Justice Powell would have found a liberty interest whenever a state established a system of parole, regardless of the wording of the statute.  442 U.S. at 19, 99 S. Ct. at 2110 (Powell, J., concurring in part and dissenting in part). Justice Powell wrote that he did not find a satisfactory distinction between parole revocation, which the majority recognized gives rise to a due process liberty interest, and parole release.  *Id.* at 19–20, 99 S. Ct. at 2110.  Justice Marshall, writing from himself, Justice Brennan, and Justice Stevens, dissented in part from the majority.  *Id.* at 22, 99 S. Ct. at 2111 (Marshall, J., dissenting in part).  Justice Marshall thought it "self-evident that all individuals possess a liberty interest in being free from physical restraint."  *Id.* at 23, 99 S. Ct. at 2111–12.  Like Justice Powell, Justice Marshall further believed that *Morrissey v. Brewer,* 408 U.S. 471, 481–82, 92 S. Ct. 2593, 2600–01 (1972) (finding a liberty interest in proceeding revoking parole), was dispositive.  442 U.S. at 26–27, 99 S. Ct. at 2113–14.

Board cites *Montgomery* for the proposition that "the mere act" of allowing juvenile offenders "to be considered for parole ensures that juveniles whose crimes reflected only transient immaturity—and who have since matured—will not be forced to serve a disproportionate sentence in violation of the Eighth Amendment." 577 U.S. at ___, 136 S. Ct. at 736 (second quotation).

The Board further contrasts a front-end sentencing decision where the court decides whether to impose LWOP with a back-end parole review where, the Board suggests, a lesser interest is at stake. The Board also emphasizes the difference between parole revocation and parole release. Citing *Greenholtz*, 442 U.S. at 9–11, 99 S. Ct. at 2105, the Board states, "An inmate who has gained his freedom through parole is entitled to much greater due process protection than one who only has a mere expectancy of someday gaining a parole release." Because Bonilla has no guaranteed right to parole, the Board argues, no liberty interest is present under the authority of *Greenholtz*.

On the question of whether a juvenile offender has a liberty interest in a meaningful opportunity to demonstrate maturity and rehabilitation and thereby gain release, we agree with Bonilla. We come to this conclusion for a number of reasons.

At the outset, it is important to recognize that there are two ways a liberty interest protected by due process may arise. A prisoner can have a liberty interest arising from the Federal or Iowa Constitutions. *See, e.g.*, *Vitek v. Jones*, 445 U.S. 480, 493–94, 100 S. Ct. 1254, 1264 (1980) (holding that there is a constitutionally protected liberty interest in avoiding involuntary psychiatric treatment). Alternatively, a prisoner can have a state-created liberty interest. *See, e.g.*, *Wolff v. McDonnell*, 418 U.S. 539, 557, 94 S. Ct. 2963, 2975 (1974) (holding that state-created right to

good time engenders liberty interest in avoiding deprivation of the right). Bonilla focuses on the first method, arguing that a liberty interest arises because of the constitutional right to a meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.

First, unlike a prisoner who is entitled to parole only as a matter of legislative grace, a juvenile offender under *Graham–Miller* is constitutionally entitled to receive the meaningful opportunity to demonstrate maturity and rehabilitation. *Graham*, 560 U.S. at 75, 130 S. Ct. 2030. The legislature may abolish parole, as a number of states have done, but no legislature can override *Graham–Miller*. While Bonilla has no right to a guarantee of release, he is constitutionally entitled to a reasonable channel to demonstrate maturity and rehabilitation. *Greiman*, 79 F. Supp. 3d at 945. As noted in *Diatchenko*, *Graham–Miller* does not create a constitutional expectation of release through parole;

> [r]ather, what is at issue is [the requirement of the Massachusetts constitutional provision on cruel and unusual punishment] that a juvenile homicide offender serving a mandatory life sentence be provided a meaningful opportunity to obtain release, so that his or her sentence is not effectively one of straight life in prison—an outcome that [the Massachusetts Constitution] prohibits. In this context, where the meaningful opportunity for release through parole is necessary in order to conform the juvenile homicide offender's mandatory life sentence to the requirements of [the Massachusetts Constitution], the parole process takes on a constitutional dimension that does not exist for other offenders whose sentences include parole eligibility.

27 N.E.3d at 357; *see also Brown v. Precythe*, No. 2:17-CV-04082-NKL, 2017 WL 4980872, at *12 (W.D. Mo. Oct. 31, 2017) ("[T]he juvenile offender has a liberty interest in a meaningful parole review.").[4]

---

[4]A similar result was reached in *Hayden v. Keller*, 134 F. Supp. 3d 1000, 1009 (E.D.N.C. 2015). In *Hayden*, the court did not explicitly rely on due process but instead emphasized the "meaningful opportunity" language in *Graham–Miller*, thereby resting its decision on Eighth Amendment grounds. *Id.*; *see also Md. Restorative Justice Initiative v.*

Second, the ruling in *Montgomery* supports Bonilla. In *Montgomery*, the Court considered whether *Graham–Miller* was retroactive. 577 U.S. at ___, 136 S. Ct. at 725. The *Montgomery* Court answered the question in the affirmative. *Id.* at ___, 136 S. Ct. at 734. The rationale for retroactive application of the requirements of *Graham–Miller* arose because the Supreme Court considered the requirement substantive in nature. *Id.* The substantive rights that supported retroactive application in *Montgomery* are more than a "mere hope" which the Supreme Court held did not give rise to due process protections in the ordinary parole context. *Greenholtz*, 442 U.S. at 11, 99 S. Ct. at 2105.

Nothing in *Greenholtz* is to the contrary. In *Greenholtz*, while the majority did not find a constitutionally based liberty interest for adult offenders, the Supreme Court found that the Nebraska parole statute, which used mandatory "shall" language, gave rise to a *statutory* liberty interest entitled to due process protections. *Id.* at 12, 99 S. Ct. at 2106. Likewise, in *Board of Pardons v. Allen*, 482 U.S. 369, 377–81, 107 S. Ct. 2415, 2420–22 (1987), the Court held that the Montana parole statute gave rise to a liberty interest based on the mandatory language "shall" and that the parole board would grant parole when designated findings were made.

Just as the mandatory language in a parole statute may give rise to a constitutionally protected liberty interest, a constitutional liberty interest arises under *Graham–Miller* that imposes a constitutionally based

*Hogan*, No. ELH-16-1021, 2017 WL 467731, at *21 (D. Md. Feb. 3, 2017) ("It is difficult to reconcile the Supreme Court's insistence that juvenile offenders with life sentences must be afforded a 'meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation' if the precept does not apply to the parole proceedings that govern the opportunity for release." (quoting *Graham*, 560 U.S. at 75, 130 S. Ct. at 2030)). Additionally, the *Hayden* court specifically noted that *Greenholtz* did not consider whether Nebraska's parole scheme comported with due process as applied to juveniles. 134 F. Supp. 3d at 1010.

mandatory requirement on the Board to provide a juvenile offender with a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Graham*, 560 U.S. at 75, 130 S. Ct. at 2030. If the Board determines that a juvenile offender has demonstrated maturity and rehabilitation, parole or work release is required as a matter of law. *See Montgomery*, 577 U.S. at ___, 136 S. Ct. at 736 ("Allowing those offenders to be considered for parole ensures that juveniles whose crimes reflected only transient immaturity—and who have since matured—will not be forced to serve a disproportionate sentence in violation of the Eighth Amendment."); *Graham*, 560 U.S. at 75, 130 S. Ct, at 2030 ("A State is not required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime. What the State must do, however, is give defendants like Graham some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation."). The Board conceded this point at oral argument stating its "agree[ment] that . . . the Board would be abusing its discretion in that circumstance if it allowed those [other] factors . . . to overwhelm the factors of rehabilitation and maturity."

For the above reasons, we conclude that a juvenile offender has a liberty interest in the proper application of *Graham–Miller* principles under the Due Process Clause in the Fourteenth Amendment to the Federal Constitution and independently under the due process provision of article I, section 9 of the Iowa Constitution.

**D. Specific Procedural Requirements Under *Graham–Miller*.**

1. *Introduction.* We now proceed to consider the specific facial procedural challenges to the parole process identified by Bonilla. In considering the procedures supported by due process, the parties agree that we should engage in the balancing test presented by *Mathews*, 424 U.S. at 335, 96 S. Ct. at 903. *See also Bowers*, 638 N.W.2d at 691

(applying the balancing test used in *Mathews* to claims brought under the Iowa Constitution). Under *Mathews*, the three factors to be balanced in determining what process, if any, a person is entitled to when faced with government action are,

> [f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. at 335, 96 S. Ct. at 903. As a general matter, due process requires, at a minimum, notice and an opportunity to be heard. *Boddie v. Connecticut*, 401 U.S. 371, 378, 91 S. Ct. 780, 786 (1971). There is, however, a sliding scale of potential procedures, varying from the relatively informal exchange of information to the highly structured procedural rights associated with trial. The question is what process is due when a juvenile offender is reviewed for parole under *Graham–Miller* principles.

We must also keep in mind the nature of Bonilla's claim. He does not seek to overturn any prior annual parole review on the ground that the procedures provided to him by the Board were constitutionally deficient. He has preserved for our consideration only a facial attack that was made and denied prior to his annual review in 2016. Because he has preserved only facial challenges, if the processes of the Board can be constitutionally applied to anyone, his facial challenge fails. *Honomichl*, 914 N.W.2d at 231. Or, if Bonilla has not made the requisite showing that he was entitled to the relief he seeks, the facial claim fails under *Jacobsma*, 862 N.W.2d at 346. We further must recognize that we generally seek to engage in interpretations of statutes (and rules) in a fashion that avoids constitutional difficulties. *State v. Nail*, 743 N.W.2d 535, 539 (Iowa 2007)

(explaining the court's approach of avoiding constitutional difficulties through statutory construction).

2. *Facial challenge to rules related to right to review and respond in writing.* Bonilla asserts that due process under the state and federal constitutions requires that he be afforded the right to review his file prior to any future annual parole review and the right to respond by offering relevant evidence or other written submissions.[5] Bonilla argues that access to materials is necessary in order to have a reasonable opportunity to review the information and determine whether to submit materials to the Board. He points to caselaw showing errors in parole files. *See, e.g., Kohlman v. Norton*, 380 F. Supp. 1073, 1074–75 (D. Conn. 1974) (holding that parole board erred in denying parole based on mistaken indication that applicant used gun in committing robbery); *In re Rodriguez*, 537 P.2d 384, 393 n.16, 396 n.19 (Cal. 1975) (en banc) (noting factually unsupported and incorrect material in parole file regarding violent tendencies and family rejection), *superseded by statute on other grounds*, Cal. Penal Code § 1170, *as recognized in People v. Jefferson*, 980 P.2d 441, 446 (Cal. 1999); *State v. Pohlabel*, 160 A.2d 647, 650 (N.J. Super. Ct. App. Div. 1960) (highlighting that presentence report erroneously showed prisoner under life sentence in another jurisdiction). *See generally Greenholtz*, 442 U.S. at 33 & n.15, 99 S. Ct. at 2117 & n.15 (Marshall, J., dissenting in part) ("[R]esearchers and courts have discovered many substantial inaccuracies in inmate files . . . .").

---

[5]Bonilla does not distinguish between due process under article I, section 9 of the Iowa Constitution and the Due Process Clause of the Fourteenth Amendment to the Federal Constitution. Some states have provided more due process protections under their state constitutions. *See, e.g., Conner v. Griffith*, 238 S.E.2d 529, 533 (W. Va. 1977) (recognizing greater protection for parolees under the West Virginia Constitution than under the Federal Constitution).

Bonilla interprets the Board's rules narrowly. Bonilla claims the rules provide an opportunity to express views and present materials only if the Board has granted the inmate an interview. Iowa Admin. Code r. 205—8.12. He argues that the rule improperly excludes annual reviews from its scope. *Id.* Bonilla claims that the Board's rules are facially defective for that reason—in other words, all juvenile offenders must, as a matter of due process, have access to materials being considered by the Board in its annual reviews of the juvenile offender and an opportunity to respond.

In support of his argument, Bonilla cites Eighth Amendment death penalty cases for the proposition that mitigating evidence must be considered by a sentencing court. *See Boyde v. California*, 494 U.S. 370, 377–78, 110 S. Ct. 1190, 1196 (1990) ("The Eighth Amendment requires that the jury be able to consider and give effect to all relevant mitigating evidence offered by petitioner."); *Skipper v. South Carolina*, 476 U.S. 1, 4, 106 S. Ct. 1669, 1671 (1986) ("[T]he sentencer may not refuse to consider or be precluded from considering 'any relevant mitigating evidence.' " (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 114, 102 S. Ct. 869, 877 (1982))). Bonilla argues that allowing a prisoner access to the file material and an opportunity to respond would increase the reliability and legitimacy of the parole process. *See* Sarah French Russell, *Review for Release: Juvenile Offenders, State Parole Practices, and the Eighth Amendment*, 89 Ind. L.J. 373, 424 (2014) [hereinafter Russell].

The Board asserts the procedures required for an annual parole review are different from those required at capital sentencing. The Board notes the interest in a capital sentencing hearing is much greater than at an annual parole review.

The Board also interprets the applicable rule differently than Bonilla. The Board asserts that under the applicable rule, "The board shall normally consider only information that has been reviewed by the inmate . . . ." Iowa Admin. Code r. 205—8.11. Additionally, the Board notes, "The inmate shall be given the opportunity to respond to information." *Id.* r. 205—8.11(2). Further, the Board points out, "The staff of the department of corrections shall discuss the information with the inmate and disclose to the inmate any factual allegations if the disclosure can be done in a manner that protects confidential sources." *Id.* r. 205—8.11(1). Finally, although without specific citation to a rule, the Board states in its appellate briefing that "inmates may submit to the Board in advance of any parole review or interview such documents or other written information and statements as they may deem appropriate to correct any perceived misstatements or to simply supplement their records."

We regard the basic procedural rights of access to the file and a right to provide information to the Board as representing the minimum due process protections. We note that in *Greenholtz*, 442 U.S. at 15–16, 99 S. Ct. at 2108, the United States Supreme Court considered the protections afforded to parolees with a statutorily created liberty interest in parole. In *Greenholtz,* the Nebraska parole system provided a right of access to the file in the parole board's discretion, a right to make written submissions, and the right to personally appear before the parole board. *Id.* at 15 & n.7, 99 S. Ct. at 2108 & n.7. The *Greenholtz* Court characterized these procedural requisites as *minimum* procedural protections sufficient to pass due process muster. *See id.* at 16, 99 S. Ct. at 2108.

These minimal procedural protections identified in *Greenholtz* are important to allow a juvenile offender to respond to information in a parole

file that might be inaccurate. As noted by one parole authority, a file may contain " 'soft' information" or even "unsubstantiated rumors." Neil P. Cohen, *The Law of Probation and Parole* § 6:20 (2d ed.), Westlaw (database updated June 2018) [hereinafter Cohen]. An inmate would have no opportunity to correct such erroneous information without access to the file and a right to respond. *Id.*

The Utah Supreme Court addressed the question of whether an offender was entitled to file review in connection with his initial parole determination hearing in *Labrum v. Utah State Board of Pardons*, 870 P.2d 902, 903 (Utah 1993). The *Labrum* court noted the close relationship between parole and sentencing. *Id.* at 908. The *Labrum* court pointed to a well-known article by criminal law expert Sanford Kadish, who noted, "Determinations by Boards of Parole whether and when to release the offender on parole are in some measure equivalent to the sentencing determinations of the judge." *Id.* (quoting Sanford H. Kadish, *The Advocate and the Expert—Counsel in the Peno-Correctional Process*, 45 Minn. L. Rev. 803, 812 (1961)). Just as a judge gives the offender an opportunity to review and respond to a presentence report, the *Labrum* court concluded, an inmate is entitled to review the parole file in an original parole grant hearing under article I, section 7 of the Utah Constitution. *Id.* at 909.[6]

Applying the balancing test of *Mathews*, we conclude, with respect to annual parole reviews, a juvenile offender has a due process right to access the file considered by the Board and an opportunity to present additional relevant information to the Board.[7] The juvenile offender has a

---

[6]In Utah, the hearing sets a presumptive release date and "an inmate has a reasonable expectation that the term decided upon at the original release hearing will turn out in fact to be his or her actual prison term." *Id.* at 908–09.

[7]We recognize that the rules of the Board provide that some information in the file might, for security reasons, be withheld from disclosure to the juvenile offender as

liberty interest, the process will provide some enhancement to the reliability of the process, and the burden on the state is minimal.

We now examine the rules of the Board to determine whether they facially comply with the due process requirement of access to the file and an opportunity to respond. The Board's rules present some ambiguities and gaps, but our obligation, if possible, is to give the rules an interpretive gloss that complies with constitutional requirements. *See, e.g., Nail*, 743 N.W.2d at 539.

Rule 8.11 provides that "[t]he board shall normally consider only information that has been reviewed by the inmate, except when the board deems such review not feasible." Iowa Admin. Code r. 205—8.11. The rule does not specifically state whether it applies to annual review hearings or only interview-type hearings, but we construe the rule to cover annual review proceedings to avoid constitutional difficulties.

Assuming the rule applies to annual parole reviews of juvenile offenders, we are concerned about the potential scope of the qualifiers "normally" and "when . . . feasible." These open-textured words and phrases could, perhaps, be applied in a fashion to defeat the rule. For example, a view that the phrase "normally" vests broad discretion in the Board to determine whether to release or the scope of release, and a construction of the phrase "when . . . feasible" as providing a broad pragmatic exception of convenience to disclosure, would raise serious due process concerns. A narrow construction, however, to mean that disclosure may be considered not "normally" available or not "feasible" only when disclosure could jeopardize the health or safety of the inmate or

_____

confidential. *See* Iowa Admin. Code r. 205–8.11(1). *See generally Duckworth v. Williams*, 494 N.E.2d 368, 369 (Ind. Ct. App. 1986) (considering question of whether an inmate was entitled to confidential file in preparation for parole hearing). No such issue is posed in this case.

a third party would likely survive constitutional scrutiny in most circumstances.

We also note that rule 8.11(3) has certain limitations to disclosure. *Id.* r. 205—8.11(3). This provision states that the Board is to separate, as far as possible, opinion from factual information and that "[t]he factual information shall be made available for review by the inmate; opinion information shall be confidential." *Id.* The rule further states that "[p]sychiatric or psychological test results or diagnoses shall be deemed confidential." *Id.*

From a due process perspective, failure to disclose opinion information or psychiatric or psychological test results that may be considered by the Board in an annual review hearing is problematic. We note that ordinarily under the Board's rules, "confidential" information in an individual's own records may be disclosed "except for those records that could result in physical or psychological harm to the individual or others, and disciplinary reports." *Id.* r. 205—6.4(3)(*d*). The opinion evidence and the psychiatric or psychological tests results are expressly labeled "confidential" in rule 8.11(3). Thus, this information may be released to the inmate unless there is a health or safety issue present.

There is a potential question regarding the scope of permitted supplementation of the parole file by an inmate. As indicated above, the Board takes the position that an inmate may offer written supplementation to correct any errors or perceived misstatements or "to simply supplement their records." The Board's rules expressly state that an inmate being interviewed by a board panel be given "ample opportunity to express views and present materials." *Id.* r. 205—8.12. This rule, however, does not seem to apply to annual parole reviews where no interview occurs. There is, however, a provision in rule 8.11(2) stating that "[t]he inmate shall be

given the opportunity to respond to information" in the Board's file. *Id.* r. 205—8.11(2).

The Board broadly interprets the provisions of rule 8.11(2) to include a right not simply to directly respond to information in the file but "to simply supplement their records." Thus, a juvenile offender inmate is not limited to providing information to rebut a specific fact in the file, they may also affirmatively present information tending to show maturity and rehabilitation. We accept the Board's interpretation of rule 8.11(2) as allowing a juvenile offender to supplement the file with, for instance, expert opinions, statements from third parties, evidence of prison achievement, and other items that may not rebut a specific piece of factual information in the Board's file but which presents a broader picture for the Board's consideration.

Given the above gloss on the applicable Board rules, we conclude that they survive a facial due process challenge. We take no view, of course, of any specific dispute that may arise under the rules. As a result, we find no basis for providing Bonilla with relief under Iowa Code section 17A.19.

3. *In-person presence at review hearing.* Bonilla argues the Board has refused to allow him to attend his annual reviews, and as a result, he has been denied the opportunity to engage in a colloquy about the extent of his rehabilitation. Bonilla cites *Goldberg v. Kelly*, 397 U.S. 254, 269, 90 S. Ct 1011, 1021 (1970), for the proposition that

> written submissions do not afford the flexibility of oral presentations; they do not permit the recipient to mold his argument to the issues the decision maker appears to regard as important. Particularly where credibility and veracity are at issue, as they must be in many termination proceedings, written submissions are a wholly unsatisfactory basis for decision.

Bonilla emphasizes that "written submissions are a particularly inappropriate way to distinguish a genuine hard luck story from a fabricated tall tale." *Califano v. Yamasaki*, 442 U.S. 682, 697, 99 S. Ct. 2545, 2555 (1979). Further, Bonilla argues that the lack of an in-person presence is particularly problematic for juvenile offenders as they "often 'lack the educational attainment necessary to write effectively' and are likely to be much more capable of expressing themselves orally." Russell, 89 Ind. L.J. at 423 (footnote omitted) (quoting *Goldberg*, 397 U.S. at 269, 90 S. Ct. at 1021).

Bonilla recognizes that the Board is authorized by statute to interview offenders. Iowa Code § 906.5(1)(*b*). Further, Bonilla cites the Board's rules relating to inmate interviews. Iowa Admin. Code r. 205—8.8 (requiring notice to an inmate "to be interviewed"); *id.* r. 205—8.12 (providing that the Board "in its discretion" may interview the inmate); *id.* r. 205—8.14(2) (stating rules governing conduct of inmate at parole proceedings). Bonilla asks that the right of juvenile offenders to be present and make a presentation be extended to annual parole reviews.

The Board counters that the procedures sought by Bonilla are not constitutionally compelled. According to the Board, the mere fact that a procedure may seem fairer or wiser does not mean that it is constitutionally required. *Ghost Player*, 860 N.W.2d at 330. The Board asserts that the present procedural regime, which includes interviews of offenders in the Board's discretion, is sufficient for the purposes of due process.

There is some authority that due process also requires that an inmate being considered for parole has a right to personally appear before the Board to press the case for release based upon demonstrated maturity and rehabilitation. In *Worden v. Montana Board of Pardons and Parole*,

962 P.2d 1157, 1166 (Mont. 1998), and *Sage v. Gamble*, 929 P.2d 822, 825–26 (Mont. 1996), the Montana Supreme Court held that a prisoner is entitled to appear personally and verify or refute the accuracy of board records and present any special considerations in support of parole. *But see Mahaney v. State*, 610 A.2d 738, 742 (Me. 1992) (holding that when review is based primarily on inmate files, due process did not require personal appearance).

Nonetheless, we do not think the Board's discretionary approach to in-person interviews in connection with routine annual reviews of a juvenile offender's file is constitutionally infirm. An interview with the inmate is not constitutionally required in each and every annual meeting when, in many cases, there may be no important factual disputes of any kind. For example, a class "A" juvenile offender receiving his first annual review after turning eighteen ordinarily has little claim that a mandatory personal appearance is required by due process as the likelihood that a personal appearance would have impact on the Board's parole decision would be extremely remote. While we think a review of the file and opportunity to respond in writing is an every time constitutional requirement in the context of annual reviews, we simply cannot say the same applies to the right to be present at the review itself.

Further, we note that while Bonilla generally states he wishes to appear in person, he did not in his motion before the Board make a specific showing of why such an appearance would be helpful or promote the accuracy or fairness of the process. He did not, for instance, point to any credibility issues that he wished to challenge through a personal appearance at a future annual review. Because this is a facial challenge, we have no occasion to determine whether in some circumstances an in-person presence of a juvenile offender might be constitutionally required

at an annual review, but we do decide that an in-person presence is not always required at each and every annual review. As a result, Bonilla's facial challenge fails under *Honomichl*, 914 N.W.2d at 231 ("A facial challenge is one in which no application of the statute could be constitutional under any set of facts."). Further, in the alternative, Bonilla has failed to make an adequate showing that a refusal of the Board to grant him an in-person interview is facially unconstitutional as applied to him, thereby failing to meet the approach to facial challenges of *Jacobsma*, 862 N.W.2d at 346 ("[I]f a statute is constitutional as applied to a defendant, the defendant cannot make a facial challenge unless a recognized exception to the standing requirement applies.").

Of course, we take no position as to whether, in the future, in the context of a specific annual review and a specific factual record, Bonilla might be able to make an as-applied due process challenge to the failure of the Board to permit him to appear at an annual review. But his challenge in this case on this record fails.

4. *Right to verifiable information.* Bonilla asks us to declare that due process prohibits the Board from considering unverified information such as generic notes and behavioral logs. Bonilla points out that generic notes are not subject to a fact-finding process or refutation by the offender at the time the notes are generated. As a result, Bonilla contends, a parole determination could be based on unreliable information that the inmate has no realistic chance to rebut. Bonilla thus asks that the Board cull unverified information from the annual review file.

The Board counters, citing *Propps*, 897 N.W.2d at 102, that it is in the best position to determine whether an individual has benefitted from opportunities for maturation and rehabilitation. The Board suggests that in order for it to be best informed, there should be no categorical

elimination of its access to "generic notes" or other "unverified" contemporaneous observations of the behavior of the inmate or others. The Board notes that under Iowa Code section 906.5(3), it is to consider "all pertinent information." The Board argues that generic notes and behavioral logs can provide information on the ability of an inmate to positively interact with correctional officers and fellow inmates. The Board further notes that under the policy of the department of corrections, such notes are to be objective and based on professional judgment. Information is to be marked as "alleged" if not verified. *See* Iowa Dep't of Corr., Policy and Procedures, No. AD-IS-05, ICON Generic Notes at 2 (effective May 2016), https://doc.iowa.gov/sites/default/files/ad-is-05_icon_generic_ notes.pdf.

We do not find that due process requires the Board to exclude contemporaneous "generic notes" or similar information from the annual review file of a juvenile offender. Parole boards are generally permitted to consider reliable hearsay evidence. *See* Cohen § 6:19. The lack of the ability of an inmate to contemporaneously challenge observations in the generic notes and the like go to the weight, if any, the Board may give the information. Further, by granting Bonilla access to the file and an opportunity to respond, the risk that the Board will rely upon harmful but erroneous unverified information is reduced. Further, as noted above, intraagency appeal and resort to an appeal under the Iowa Administrative Procedures Act provide further protection against the potential reliance on erroneous information in the files. *See Larson v. City of Fergus Falls*, 229 F.3d 692, 697 (8th Cir. 2000).

For the above reasons, we do not believe the Board has a responsibility to scour its file and remove all information that Bonilla or any other inmate considers "unverified." If the Board is unreasonable in

its reliance on speculative and unsubstantiated information in the file, the inmate may launch a challenge to the parole decision under Iowa Code chapter 17A. The district court properly refused to grant declaratory relief to Bonilla on the ground that the Board allowed "unverified" information to remain in the file.

5. *Adequate notice of future hearings and written guidance.* Bonilla asserts that in order to have a meaningful opportunity to be heard, "the Board must provide him with a timely, comprehensive written decision from the Board detailing the reasons for denying him release." Such a written decision, according to Bonilla, is to include a discussion of all appropriate mitigating factors and specific guidelines and recommendations for programming and treatment that will assist in his rehabilitation.

In support of his argument, Bonilla cites *Swarthout v. Cooke*, 562 U.S. 216, 131 S. Ct. 859 (2011). Bonilla maintains that *Swarthout* stands for the proposition that due process is satisfied where inmates "were allowed to speak at their parole hearings and to contest the evidence against them, were afforded access to their records in advance, and were notified as to the reasons why parole was denied." *Id.* at 220, 131 S. Ct. at 862.

The Board asserts that a detailed written ruling is not required to inform Bonilla and other offenders of the reasons they were denied parole. The Board notes that in *Greenholtz* the Supreme Court observed, "To require the parole authority to provide a summary of the evidence would tend to convert the process into an adversary proceeding and to equate the Board's parole-release determination with a guilt determination." 442 U.S. at 15–16, 99 S. Ct. at 2108.

Upon review of the record, we conclude that Bonilla has failed to mount a sustainable facial challenge to the Board's policies or practices. The record in this case does not establish that the Board as a matter of policy declines to advise an inmate of the fact that parole has been denied or fails to provide the general reason for the denial. Indeed, the record suggests that Bonilla has multiple avenues to communicate with the department of corrections and the Board related to his status. For example, the Board prepares a parole release plan that the inmate can review and seek to modify. The parole release plan then becomes part of the information that the Board may rely upon in its annual review. There is no categorical due process requirement that after every review the Board issue what Bonilla seems to desire, namely, detailed findings of fact or conclusions of law with respect to the denial of parole.

We do not suggest, however, that boilerplate statements are sufficient. Repeated use of boilerplate generalities will not suffice. *U.S. ex rel. Scott v. Ill. Parole and Pardon Bd.*, 669 F.2d 1185, 1191 (7th Cir. 1982), *overruled on other grounds by Heidelberg v. Ill. Prisoner Review Bd.*, 163 F.3d 1025, 1027 (7th Cir. 1998). What are required are sufficient reasons to facilitate appellate review. *State v. Tillinghast*, 609 A.2d 217, 218 (R.I. 1992) (per curiam) ("[A] denial of parole should be accompanied by a statement of reasons for the board's action that is sufficient to enable a reviewing court to determine if parole has been withheld for permissible reasons."); *State v Ouimette*, 367 A.2d 704, 710 (R.I. 1976.).

As a result, we think the district court did not err in declining to provide Bonilla with relief on this ground.

6. *Programming and treatment.* Bonilla claims that lack of access to programing and treatment that would aid his rehabilitation deprives him of a meaningful opportunity to obtain release in violation of his rights

to due process and to be free from cruel and unusual punishment. Bonilla challenges what he characterizes as a "Catch 22," namely, that he cannot be considered seriously for parole until he completes the sex offender treatment program, or SOTP, but he cannot gain access to SOTP until he is being seriously considered for parole. Bonilla notes that at least one federal court has ordered that "no prisoner sentenced to life imprisonment without parole for a crime committed as a juvenile will be deprived of any educational or training program which is otherwise available to the general prison population." *Hill v. Snyder*, No. 10-14568, at 2 (E.D. Mich. Nov. 26, 2013), https://www.aclu.org/sites/default/files/field_document/ hillorderrequiringparoleprocess.pdf. He further notes that a number of state legislatures have enacted provisions that require parole authorities to make available appropriate programming to prepare a juvenile offender for return to the community. *See* Cal. Penal Code § 3041(a)(1); Wash. Rev. Code Ann. § 10.95.030(3)(e) (West, Westlaw through ch. 412 of 2019 Reg. Sess. 2019).

The Board counters with authorities that it claims stand for the proposition that there is no constitutional right to any specific treatment program while in prison. *Wishon v. Gammon*, 978 F.2d 446, 450 (8th Cir. 1992); *Stewart v. Davies*, 954 F.2d 515, 516 (8th Cir. 1992). Yet, the Board recognizes in *Belk v. State*, 905 N.W.2d 185, 191 (Iowa 2017), we held that Iowa Code chapter 822 provided the proper procedural vehicle for an inmate to assert a claim that a delay in providing sex offender treatment unconstitutionally deprived him of a protected liberty interest in accessing parole. The Board argues, however, that the proper party to any alleged delay in treatment is the department of corrections, not the Board.

As noted in *Graham*, "[i]n some prisons . . . the system itself becomes complicit in the lack of [a juvenile offender's] development" through the

withholding of education and rehabilitation programs. 560 U.S. at 79, 130 S. Ct. at 2032–33. According to *Graham,* "[D]efendants serving life without parole sentences are often denied access to vocational training and other rehabilitative services that are available to other inmates." *Id.* at 74, 130 S. Ct. at 2030. Building on *Graham,* one commentator has noted that "[p]roviding access to these kinds of programs is . . . central to creating realistic opportunities for release." Caldwell, 40 N.Y.U. Rev. L. & Soc. Change at 291.

If the state, through the Board, wishes to condition release upon successful completion of certain programing such as SOTP, the department of corrections cannot unreasonably withhold such programming from a juvenile offender. Otherwise, the state could effectively deprive a juvenile offender of a meaningful opportunity to show maturity and rehabilitation by establishing release criteria that the state prevents the juvenile offender from meeting. The department of corrections does not have a pocket veto over the release of a juvenile offender through the withholding of services required by the Board for the release of a juvenile offender.

It may be, however, that the Board has limited direct authority over the department of corrections. If the department of corrections fails to act reasonably in light of the communication from the Board regarding programming, the juvenile offender may file a claim against the department under Iowa Code chapter 822, alleging that by denying reasonable access to the programming necessary to obtain an opportunity for release, the state is failing to live up to the requirements of *Graham–Miller. See Belk,* 905 N.W.2d at 191.

7. *Right to counsel.* Bonilla asserts that he is entitled to appointed counsel at his annual parole reviews under article I, sections 9, 10, and

17 of the Iowa Constitution and under the Eighth and Fourteenth Amendments to the Federal Constitution. According to Bonilla, appointing counsel for indigent juvenile offenders would assist them in obtaining a meaningful opportunity to demonstrate maturity and rehabilitation under *Graham–Miller*.

Bonilla claims that Iowa Code section 906.7, which provides that "[t]he board shall not be required to hear oral statements or arguments either by attorneys or other persons," fails to pass constitutional muster as applied to juvenile offenders for several reasons. Bonilla notes that article I, section 10 of the Iowa Constitution extends the right to counsel to cases involving life or liberty and that an annual parole review falls within the protection of the "cases" clause. *State v. Young*, 863 N.W.2d 249, 278 (Iowa 2015). Citing *Morrissey v. Brewer*, 408 U.S. 471, 481–82, 92 S. Ct. 2593, 2600–01 (1972), Bonilla also claims that the due process clause attaches to parole reviews and that counsel should be appointed to protect the liberty interest involved in *Graham–Miller*.

The Board responds that there is no statutory authority under Iowa law for the provision of the right to counsel at state expense. The Board states that inmates facing prison disciplinary proceedings have no right to either retained or appointed counsel even if the accrual of good time is jeopardized. *Giles v. State*, 511 N.W.2d 622, 627 (Iowa 1994). The Board sees a parole hearing as akin to a prison disciplinary hearing. If there is no right to counsel in a prison disciplinary hearing where good time credit is lost, the Board contends, there should be no right to counsel in an annual parole review.

We first consider the applicability of article I, section 10 of the Iowa Constitution. In an early case, we noted that the confrontation clause in article I, section 10 of the Iowa Constitution affords "a personal right

limited to proceedings in criminal prosecutions, or where the life or liberty of the citizen is involved." *State v. Polson*, 29 Iowa 133, 135 (1870). Another early case held that the Iowa right to jury provision in article I, section 10 applies to contempt proceedings. *Ex parte Grace*, 12 Iowa 208, 213–14 (1861) (holding that while the cases clause of article I, section 10 may have been "intended to meet the case of a fugitive slave," there is "no reason in the nature of things, nor in the language employed, to justify the conclusion that white men were not also entitled to the benefit of it" in a contempt proceeding). We have also held that the right to counsel extends beyond the filing of a formal criminal prosecution. *State v. Green*, 896 N.W.2d 770, 777 (Iowa 2017). Bonilla now seeks to extend the right to counsel under article I, section 10 to annual reviews by the Board. In order to be applicable, however, the proceeding must involve a case. We turn now to the meaning of that term.

Ordinarily, the term "case" refers to an adversary proceeding where parties present conflicting views for determination by a neutral adjudicator. *See Case, Black's Law Dictionary* (11th ed. 2019) (defining "case" as "[a] civil or criminal proceeding, action, suit, or controversy at law or in equity"). The purpose of the right to counsel is to ensure, among other things, that an individual is not overpowered by the resources of the state and has a reasonable opportunity to present arguments of fact and law to a neutral decision-maker. *Green*, 896 N.W.2d at 776 (noting that the right to counsel "is 'indispensable to the fair administration of our adversary system of criminal justice,' " and that "[o]ur founders provided it because the system is balanced only when both the state and the accused have the professional assistance of counsel" (quoting *Brewer v. Williams*, 430 U.S. 387, 398, 97 S. Ct. 1232, 1239 (1977))); *State v. Peterson*, 663 N.W.2d 417, 426 (Iowa 2003) (recognizing that the

constitutional guarantee of counsel "maintains the fair administration of our criminal justice system by assuring aid to the accused when confronted by the government adversary").

For instance, in *In re Brewer*, 224 Iowa 773, 774, 276 N.W. 766, 766 (1937), we considered whether a person adjudged insane by a commission is entitled to a jury when appealing to the district court. We said the appeal was statutorily classified a "special action" because

> there is no party plaintiff who demands anything against the other party . . . or who seeks the enforcement or protection of a private right or the prevention or redress of a private wrong. The proceeding is brought against one alleged to be mentally sick, for the purpose of restraining that individual until she has recovered.

*Id.* at 775, 276 N.W. at 766. We then applied this reasoning to the constitutional requirement for a jury trial in article I, sections 9 and 10 of the Iowa Constitution. *Id.* at 780, 276 N.W. at 769. We held that no constitutional right was violated because an inquisition of insanity was not a criminal proceeding and because the purpose of the proceeding was

> to aid and assist the individual, to provide means whereby the state may protect its unfortunate citizens, to furnish hospitalization and treatment so that the insane will have an opportunity to rehabilitate and readjust themselves into useful and happy citizens.

*Id.*

An annual review of the Board does not ordinarily involve a traditional adversarial proceeding. The state is not represented by the advocacy of legal counsel advocating a particular result based on fact and law. Instead, the Board assembles information to assist it in determining the progress of an offender and whether an offender should be placed on work release or parole. While the precise scope of the right to counsel under the distinctly worded provision of Iowa Constitution article I, section

10 may be subject to debate, the Iowa right to counsel under the "cases" clause does not extend beyond "cases." As a result, we conclude that ordinarily the right to counsel under article I, section 10 of the Iowa Constitution does not extend to annual review proceedings conducted by the Board.

We now turn to the question of whether due process requires that a juvenile offender's liberty interest in a meaningful opportunity to demonstrate maturity and rehabilitation requires the assistance of counsel in proceedings such as the annual review conducted by the Board.

The United States Supreme Court has considered due process implications in cases involving parole or probation in four seminal cases. In *Morrissey*, 408 U.S. at 472, 92 S. Ct. at 2596, the Supreme Court found that due process applied to a parole revocation hearing, *id.* at 482, 92 S. Ct. at 2601, but did not decide the question of whether due process required the right to counsel in a parole revocation proceeding, *id.* at 489, 92 S. Ct. at 2604.

The next case in the due process line involves the revocation of probation. In *Gagnon v. Scarpelli*, 411 U.S. 778, 779, 93 S. Ct. 1756, 1758 (1973), the Supreme Court considered what process is due in a case involving a revocation of probation. The *Gagnon* Court found that there was no distinction between the revocation of parole and the revocation of probation for purposes of determining whether an offender facing revocation had a liberty interest protected by due process. *Id.* at 782, 93 S. Ct. at 1759. The *Gagnon* Court then proceeded to address the question finessed in *Morrissey*, namely, whether an indigent probationer or parolee is entitled to appointment of counsel in revocation hearings. *Id.* at 783, 93 S. Ct. at 1760.

The *Gagnon* Court concluded that there was no across-the-board rule regarding the right to appointed counsel in cases involving probation revocation. *Id.* at 787–90, 93 S. Ct. at 1762–63. Among other things, the *Gagnon* Court feared that the introduction of counsel for the offender into revocation proceedings would change the nature of the proceeding. *Id.* at 787–88, 93 S. Ct. at 1762–63. If counsel for the offender appears, the *Gagnon* Court reasoned, the state would also want counsel. *Id.* at 787, 93 S. Ct. at 1762. The process may, as a result, become an adversarial process less attuned to the rehabilitative needs of the individual probationer or parolee. *Id.* at 787–88, 93 S. Ct. at 1762–63.

As a result, the *Gagnon* Court decided that the right to appointed counsel in a probation or parole revocation proceeding can be determined only on a case-by-case basis. *Id.* at 790, 93 S. Ct. at 1763. The *Gagnon* Court stated that it was "neither possible nor prudent to attempt to formulate a precise and detailed set of guidelines . . . to meet the applicable due process requirements." *Id.* at 790, 93 S. Ct. at 1764. Yet the *Gagnon* Court suggested that counsel presumptively should be provided where the probationer or parolee makes a timely request and claims that he or she did not commit the alleged violation or that there are substantial reasons in mitigation and that the reasons are complex or otherwise difficult to develop or present. *Id.* at 790–91, 93 S. Ct. at 1764. In doubtful cases, the *Gagnon* Court urged the authorities to consider whether the probationer appears capable of speaking effectively for himself. *Id.*

The third seminal due process case involved prison discipline. In *Wolff*, 418 U.S. at 542–43, 94 S. Ct. at 2968, the Supreme Court considered whether a prisoner facing disciplinary proceedings that could lead to loss of good time, and thereby extend his incarceration, was entitled to the assistance of counsel in the disciplinary proceeding. The *Wolff*

Court approached the issue gingerly. According to the *Wolff* Court, "At this stage of the development of these [disciplinary] procedures we are not prepared to hold that inmates have a right to either retained or appointed counsel in disciplinary proceedings." *Id.* at 570, 94 S. Ct. at 2981. The *Wolff* Court, however, noted that "[w]here an illiterate inmate is involved" or where "the complexity of the issue makes it unlikely that the inmate will be able to collect and present the evidence necessary for an adequate comprehension of the case," the inmate "should be free to seek the aid of a fellow inmate, or . . . to have adequate substitute aid in the form of help from the staff or from a sufficiently competent inmate designated by the staff." *Id.* at 570, 94 S. Ct. at 2982. The *Wolff* Court closed its discussion by indicating that its conclusions were "not graven in stone." *Id.* at 571–72, 94 S. Ct. at 2982.

Three justices dissented in part in *Wolff*. *Id.* at 580, 94 S. Ct. at 2986 (Marshall, J., concurring in part and dissenting in part); *id.* at 593, 94 S. Ct. at 2993 (Douglas, J., dissenting in part and concurring in the result in part). On the issue of right to counsel, Justice Marshall noted that in *Gagnon*, counsel would be available in some cases and that the same principle should apply to disciplinary proceedings. *Id.* at 591, 94 S. Ct. at 2992 (Marshall, J., concurring in part and dissenting in part). Justice Marshall agreed with the majority, however, that counsel was not required in every case and that counsel substitutes such as law students might be available to assist in a prisoner's defense. *Id.* at 591–92, 94 S. Ct. at 2992.

Finally, in *Greenholtz*, 442 U.S. at 3, 99 S. Ct. at 2102, the United States Supreme Court considered whether a prisoner seeking a grant of parole is entitled to due process protections. The *Greenholtz* majority determined that a prisoner did not have a constitutionally based liberty

interest in parole release. *Id.* at 7, 99 S. Ct. at 2104. In reaching this conclusion, the *Greenholtz* Court distinguished between parole revocation and parole release. *Id.* at 9, 99 S. Ct. at 2105. The *Greenholtz* Court noted that a prisoner seeking release is confined and thus has a lesser interest in liberty than a parolee who has already been released. *Id.* Further, the revocation of parole or probation, according to the *Greenholtz* Court, had a fact-based element that was absent in the decision to grant parole. *Id.* at 9–10, 99 S. Ct. at 2105.

The above federal cases demonstrate the difficulty in determining when due process (fundamental fairness) requires that an offender be provided with legal counsel in a variety of contexts. The United States Supreme Court has been tentative, guarded, and flexible on the issue. It seems clear, however, that where an inmate is facing deprivation of a liberty interest but is not capable of self-representation, either as a result of limited abilities or as a result of the complexity of the issues, the Supreme Court as a matter of fundamental fairness may be more open to providing the inmate with some kind of assistance, even if only through a counsel substitute.

The Massachusetts Supreme Court in *Diatchenko* has addressed the question of whether a juvenile offender is entitled to counsel in an initial parole hearing. 27 N.E.3d at 356. According to the *Diatchenko* court, the task of parole authorities *in an initial parole hearing* is "far more complex than in the case of an adult offender because of 'the unique characteristics' of juvenile offenders." *Id.* at 360 (quoting *Diatchenko v. Dist. Att'y*, 1 N.E.3d 270, 286 (Mass. 2013), *superseded by statute on other grounds*, Mass. Gen. Laws ch. 279, § 24 (2016), *as recognized in Commonwealth v. Perez*, 106 N.E.3d 620, 627–28 (Mass. 2018)). Further, at the initial parole hearing in Massachusetts, notice is given to the attorney general,

government officials, the district attorney, and the victims. *Id.* at 359. As a result, the *Diatchenko* court held that a juvenile offender is entitled to legal representation at least at the initial parole hearing. *Id.* at 361.

Bonilla's facial challenge is that counsel must be provided at every annual review of a juvenile offender's parole status. We do not agree. There are certainly situations where annual reviews are relatively uncomplicated and no contested factual or legal issues are present. Even in *Diatchenko*, the right to counsel arose at an initial review hearing after fifteen years of mandatory imprisonment. There is no suggestion in *Diatchenko* that counsel is required each and every year under procedures that include an annual parole review.

Because we conclude there is no right to counsel in each and every annual review hearing for all juvenile offenders, Bonilla cannot prevail on his facial attack under *Honomichl*, 914 N.W.2d at 231. Further, Bonilla in his motion before the Board failed to show how due process would necessarily require that appointed counsel be provided to him. Bonilla had counsel in prior hearings, and although the claim was made in the motion that Bonilla was indigent, it is not clear that Bonilla would need appointed counsel in future hearings. Further, Bonilla in his motion before the Board did not show any particularized reason why counsel was essential to ensure fundamental fairness in his annual review but only generally asserted that counsel was required to assure a meaningful opportunity to demonstrate maturity and rehabilitation. Even assuming the *Morrissey–Gagnon–Wolff* line of cases has applicability in the context of annual reviews of juvenile offenders, Bonilla has not shown that the Board's policy is unconstitutional as applied to him. Therefore, Bonilla's claim also fails under *Jacobsma*, 862 N.W.2d at 346. We express no view

as to whether there might be a right to counsel under other circumstances with a different factual showing.

8. *Right to independent experts.* Bonilla claims he is entitled to independent experts at government expense to support his claim that he is entitled to parole based on demonstrated maturity and rehabilitation. Bonilla recognizes that, under Iowa Administrative Code rule 205—8.10(2), the Board may, in its discretion, "request a complete psychiatric or psychological evaluation of an inmate." However, Bonilla emphasizes, the rule does not address the need for independent expert opinion in cases involving juvenile offenders when they are being considered for parole. Although the department of corrections has engaged in very brief psychological and psychiatric evaluations of Bonilla, he notes, none of these focus on the question of whether he has been rehabilitated or how he has developed since the commission of the underlying crime.

According to Bonilla, an evaluation by a licensed psychologist with specific expertise in juvenile brain development is essential to show maturity and rehabilitation under *Graham–Miller.* In support, he cites *Roby*, 897 N.W.2d at 143–48, where this court emphasized the essential role that experts play in evaluating juveniles and cautioned against applying past, generalized attitudes about criminal behavior.

Bonilla observes that in the context of capital sentencing, due process entitles a defendant to an independent psychological evaluation, at least where the defendant claims insanity. *Ake v. Oklahoma*, 470 U.S. 68, 82, 105 S. Ct. 1087, 1096 (1985). By analogy, Bonilla argues, he is entitled to an independent expert to assist the Board in making a meaningful assessment of his maturity and rehabilitation.

The Board counters that offenders like Bonilla have been repeatedly evaluated by mental health experts. According to the Board, the in-house

evaluations conducted by the department of corrections are sufficient to establish an adequate baseline from which the Board can measure maturity and rehabilitative growth. Further, the Board argues, speculation regarding future development or growth is not a replacement for real time observations of contemporary conduct, which the Board is in a position to evaluate. *See Sweet*, 879 N.W.2d at 838–39. The Board also emphasizes that because Board membership includes a lawyer and a social worker "knowledgeable in correctional procedures and issues," Iowa Code § 904A.2, the Board has a wide range of expertise that can evaluate the eligible offender's maturity and rehabilitation.

The question of appointment of a qualified expert was raised in *Diatchenko*. The *Diatchenko* court noted that expert testimony regarding youth development might explain past conduct and assess future risks. 27 N.E.3d at 361–62. The *Diatchenko* court observed that while the assistance of a psychologist or other expert may not be necessary in every case, in some cases, the assistance might be crucial to the juvenile's ability to obtain a meaningful chance of release. *Id.* at 362.

In *Roby*, we emphasized the role of qualified experts in evaluating juvenile offenders for purposes of sentencing. 897 N.W.2d at 143–48. However, the Board is correct that in evaluating a juvenile offender for parole, the Board is in a position to evaluate additional facts not available to a sentencing court, namely, objective facts related to the adjustment and behavior of the inmate over a period of years of incarceration. As noted in *Sweet*, the Board "will be better able to discern whether the offender is irreparably corrupt after time has passed, after opportunities for maturation and rehabilitation have been provided, and after a record of success or failure in the rehabilitative process is available." 879 N.W.2d at 839. Because the Board will necessarily have a greater information base

to make its assessment, the need for expert testimony on juvenile development is diminished.

Further, as suggested in *Diatchenko*, the question of the appointment of an independent expert is generally a discretionary call for the decision-maker. There are surely circumstances where the appointment of an independent expert might make little sense. For example, the appointment of an expert makes little sense where a juvenile offender serving life in prison who is still under the age of twenty comes up for annual review because, in such circumstances, the Board has not yet had an adequate opportunity to evaluate the maturity and rehabilitation of a person whose character has not yet been completely formed. *See Null*, 836 N.W.2d at 55 ("[T]he human brain continues to mature into the early twenties."). Conversely, the Board may be entirely convinced that a juvenile offender has demonstrated the maturity and development sufficient to support release but may want to initiate release gradually in order to limit the risks and to promote a successful outcome. Independent expert juvenile development testimony in these types of cases may not be necessary or even helpful.

We thus conclude that there is no categorical right to appointed expert testimony at every annual review of a juvenile offender. As a result, the facial claim fails under *Honomichl*, 914 N.W.2d at 231. Further, in this litigation, Bonilla in his motion before the Board has failed to meet his burden of showing he is entitled to an appointed expert. *Jacobsma*, 862 N.W.2d at 346. His motion generally claimed that a comprehensive psychological evaluation was required to demonstrate maturation and rehabilitation. We do not view such a generalized request as sufficient, particularly where the Board is not relying on any adverse or negative psychological evaluation and where Bonilla appears to be making progress

toward release. We of course express no view as to whether there is a right to appointment of an independent psychologist or any other type of expert under other facts and circumstances. But Bonilla has failed in his motion before the Board to demonstrate the sufficient need to trigger a facial right to an expert on due process grounds.

## V. Conclusion.

For all the above reasons, the district court judgment in this case is affirmed.

**AFFIRMED.**